**Roderick DAVIE, Petitioner,**

v.

**Betty MITCHELL, Warden, Respondent.**

**No. 1:99CV2400.**

United States District Court, N.D. Ohio, Western Division.

Aug. 6, 2003.

Order Denying Motion to Amend Sept. 4, 2003.

---

J. Joseph Bodine, Jr., Office of the Ohio Public Defender, Randall L. Porter, Office of the Public Defender, State of Ohio, Columbus, OH, Richard M. Kerger, Kerger & Kerger, Toledo, OH, for Roderick Davie, Petitioner.

Daniel R. Ranke, Office of the Attorney General, State of Ohio, Capital Crimes Section, Jon W. Oebker, Office of the Attorney General, State of Ohio, Cleveland, OH, Stephen E. Maher, Office of the Attorney General, State of Ohio, Capital Crimes Section, Stuart A. Cole, Office of the Attorney General, State of Ohio, Corrections Litigation Section, Columbus, OH, for Betty Mitchell, Respondent.

## ORDER

CARR, District Judge.

This is a capital habeas corpus case in which the petitioner, convicted of the aggravated murder of two employees of a company in Warren, Ohio, where he had formerly been employed, the attempted aggravated murder of a third employee, and related crimes, claims that his conviction and capital sentence were prejudicially tainted by several errors of constitutional dimension.

For the reasons that follow, I conclude that the petition is without merit. It will, accordingly, be denied.

## Background

The Ohio Supreme Court accurately summarized the facts of the crimes leading to the petitioner's convictions:

On the morning of June 27, 1991, defendant-appellant Roderick Davie entered his former place of employment, Veterinary Companies of America ("VCA"), in Warren and murdered John Ira Coleman and Tracey Jefferys, and attempted to murder William John Everett.

Davie worked at VCA, a distributor of pet and veterinarian supplies in Warren, for almost a year until he was fired in April 1991. While employed at VCA, Davie got along well with fellow employees Tracey Jefferys and John Everett, and socialized with them outside the workplace. After Davie's termination from VCA, Coleman was hired as a truck driver. Approximately one week before the murders, Davie and Everett ran into each other at a cafe and had a friendly conversation.

On June 27, Everett arrived to work at VCA at approximately 6:50 a.m. Jefferys, who as VCA secretary normally arrived at 9:00 a.m., got in at 6:55 a.m. to open the building. Coleman got to work at approximately 7:20 a.m., and the three went about their normal workday routine. As Everett was loading his truck for deliveries, Davie appeared at the VCA warehouse around 7:30 a.m. and spoke briefly with him. Everett knew that Davie wasn't permitted there and brushed Davie off while continuing to load his truck. When Everett finished, he turned around, but Davie was not there. Everett proceeded into the

lunch room to pick up his supplies and invoices.

Suddenly, Davie came up behind Everett with Tracey, who was crying and shaking. Davie had a black revolver in his right hand and ordered Everett and Tracey to get in the warehouse area of the VCA building. Upon entering the warehouse, Davie yelled at Coleman, who was still loading his truck, to come over. Davie then ordered the three to lie face down on the warehouse floor.

As they were lying down, Davie said to them, "So, you all work for VCA, huh?" Everett then heard gunshots, and he saw the first shot hit the floor near his left arm. Then, Everett felt shots in the back of his head, shoulder, and left arm, but he remained conscious.

Everett heard Tracey get up and thought she ran toward the dock area. Another shot was fired. Everett heard Davie call out to Tracey, "Come here, bitch," and brought her back. Davie then said to Coleman, "So you ain't dead yet, huh, brother?" Another shot was fired. Davie then took Everett's wallet from his left rear pocket and said to Tracey, "You're lucky, I'm out of bullets." Everett heard Tracey run and open the lunch room door while Davie pursued her.

At no time did Everett see any person at VCA other than Coleman, Jefferys, and Davie. For three to five minutes, Everett heard Tracey screaming loudly from the lunch room. Then her screaming stopped, and Everett remained lying on the warehouse floor, thinking over what to do next while hearing his blood drip down the floor drain to his right. Everett looked up and initially saw neither Tracey nor Davie. As he looked around, he saw Davie with his back to him, standing in the doorway of an office. Everett, though wounded, then

made his way out of the building through the north dock door.

At that time, Donna Smith was driving along Main Street on her way to work. She saw a bleeding white male, later identified as Everett, stumbling across the VCA parking lot, and waving his hands trying to attract attention. Smith then saw a black male come out from the VCA dock area and run around the front of a parked truck. Smith stopped her car on the bridge near VCA to get out and attempt to aid Everett. Another woman driving by also stopped to help. However, before they could get to Everett, a truck came "flying out" of the VCA parking lot across both lanes of Main Street. Everett managed to get up and stumble across Main Street. He climbed over the bridge abutment and fell underneath it to get away from the truck, which was speeding towards him. The truck, however, crashed into the side of the bridge. The black male driving the truck got out, stared at Smith for about fifteen seconds, and then jumped over the side of the bridge. Smith and the other woman then went to summon help. Later that morning, Smith chose Davie's photo out of an array and identified him as the man she saw in the truck.

Everett testified that he jumped over the end of the bridge in order to avoid the truck. After the truck crashed into the bridge, Davie came at Everett with a stick and began hitting him on the head and trying to poke him in the eye. After a brief struggle, Davie apparently saw someone looking down from the bridge and fled.

Police Officer Michael Albanese arrived on the scene and found the VCA truck up against the bridge abutment. He found Everett near death on the ground down from the bridge abutment.

Albanese told Everett, who was weak and talking in a low voice, that he was going to take a dying declaration from him. Everett told him the name of his assailant, and Albanese reported the name of "Robert Davis" as the suspect over the police radio. A short time later, Albanese again asked Everett who his assailant was. Everett told Albanese that he knew his assailant, and Albanese then gave the name "Roderick Davie" out over the police radio.

Everett informed Albanese that two more people had been shot and were in the VCA building. Police officers then found John Coleman and Tracey Jefferys dead in the VCA building.

A folding chair near Jefferys's body bore Davie's fingerprint in blood. Hairs on the chair proved to be microscopically consistent with Jefferys's hair. Police found a revolver in the truck.

Dr. Roberto E. Ruiz, Chief Deputy Coroner in Summit County and Deputy Coroner in Stark County, performed autopsies on Coleman and Jefferys. He testified that Coleman, shot four times, died almost immediately when he was shot in the head. Dr. Ruiz stated that Jefferys's death was caused by lesions in the brain and skull fracture due to blunt force trauma. Dr. Ruiz opined that Jefferys's injuries could have been caused by a folding chair. Dr. Ted Soboslay, Coroner of Trumbull County, concurred in Dr. Ruiz's findings.

At approximately 8:30 a.m. on the day of the murders, Carl Miller, chief bailiff at the Warren Municipal Court, received a phone call from Dwayne "Styx" Thomas, whom he had known for several years. Thomas told Miller that he was not involved in the murders, but that he had the perpetrator with him, whom he identified as Davie. Miller and Police Captain Timothy Downs went to the White Court address given by Thomas, arrested Davie, and advised him of his Miranda rights. Because of an active capias warrant on Thomas, police also took him with Davie to police headquarters. However, Thomas was not formally placed under arrest.

At the police station, Lt. Carl Blevins and Det. Morris Hill twice advised Davie of his constitutional rights. The first time, Davie declined to sign a waiver of rights; the second time, he said that he did not want to make a statement. The questioning then ceased and Davie was taken to a cell.

Around 2:00 p.m. that afternoon, Davie told Sgt. Mark Massucci that he wanted to talk to Det. Sgt. Gary Vingle. Davie was brought back to an interview room, and police again advised him of his Miranda rights. Davie told the detectives, "I just flipped out this morning. * * * I went down to VCA and shot 'em up." Davie admitted that he shot both Coleman and Everett and that he beat Jefferys with a chair. Davie further admitted that he tried to run Everett over with a truck and that he came back home in Jefferys's car.

Sgt. Massucci testified that he went with Thomas to the White Court residence where Davie lived with his girlfriend, Sonya Barnes. There, Thomas directed Massucci to a wooded area behind the homes on White Court, where they found a plastic bag containing Davie's clothes. Davie had told Thomas that he had thrown the bag of clothing there. In the bag were bloodstained clothes, cartridge casings, and Jefferys's checkbook, which was in the back pocket of the blue jeans found in the bag. The blood stains on Davie's shirt were consistent with Jefferys's blood. The casings had been fired from the gun found in the truck.

Later in the day, detectives went to Barnes's home, where they were given permission to search the premises without a warrant. When they walked in, they saw Jefferys's black change purse on the kitchen table and Everett's wallet on top of the refrigerator. Barnes said that the change purse was not hers, and she did not know to whom it belonged. *State v. Davie*, 80 Ohio St.3d 311, 311–14, 686 N.E.2d 245 (1997).

The indictment returned by the Trumbull County, Ohio, grand jury charged the petitioner with two counts of aggravated murder, two counts of aggravated murder in the commission of a burglary, one count of attempted aggravated murder with a firearm specification, three counts of kidnaping, and two counts of aggravated robbery. The aggravated murder counts included death specifications for felony murder in the commission of aggravated burglary, kidnaping, and aggravated robbery.

The trial jury convicted the petitioner of all charges and imposed the death penalty.

On direct appeal, counsel asserted twenty-nine assignments of error. The Ohio Court of Appeals affirmed the petitioner's conviction and sentence. On direct review by the Ohio Supreme Court, the petitioner's conviction and sentence were affirmed.

In his first petition for post-conviction relief, the petitioner asserted six claims. The trial court dismissed the petition. A single assignment of error was raised on appeal from that decision, which the Court of Appeals affirmed. The Ohio Supreme Court declined to review the appellate court's decision.

The petitioner thereafter filed his initial habeas corpus petition in this court. Leave was granted to seek successive state post-conviction relief with regard to potentially unexhausted claims in that habeas petition. The trial court dismissed that petition on the basis of procedural default. The Court of Appeals affirmed.

Next, the petitioner filed a petition in the Ohio Court of Appeals under *State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992). Though that court denied the petition on the grounds of untimeliness, it also conducted a merits review of petitioner's twenty-four claims, finding all to be without merit. The Ohio Supreme Court found no merit in the four claims asserted on appeal from the Court of Appeals decision. *State v. Davie*, 96 Ohio St.3d 133, 772 N.E.2d 119 (2002).

Following his unsuccessful effort to obtain reversal of his conviction and sentence through the foregoing state court challenges, the petitioner filed his third amended habeas corpus petition. The respondent has filed an amended return of writ, the petitioner has filed a traverse, the respondent has filed a surreply, and the case is decisional.

The petitioner asserts fifty-four claims for relief. Many are inter-related, and, as the respondent's amended return of writ suggests, all are best viewed from the standpoint of the phase of the pretrial or trial proceedings to which individual claims relate. I adopt, accordingly, the respondent's organizational structure and realignment of the sequence of the claims.

As reconfigured by the respondent, the claims fall into fourteen categories:

I. Grand Jury Composition and Selection

II. Defective Indictment

III. Petit Jury Composition and Selection

IV. *Brady* Claim

V. Admission of Evidence—Trial Phase

VI. IATC [Ineffective Assistance of Trial Counsel] Trial Phase

VII. Prosecutorial Misconduct—Trial Phase

VIII. Jury Instruction—Trial Phase

IX. Tainted Jury

X. Admission of Evidence—Mitigation Phase

XI. IATC Mitigation Phase

XII. Prosecutorial Misconduct—Mitigation Phase

XIII. Jury Instructions—Mitigation Phase

XIV. Remaining Claims Categories

To the extent that the petition suggests that the evidence was insufficient to sustain petitioner's conviction, his suggestion has no merit. One of the victims, John Everett survived being shot, pursued, and beaten. Everett identified the petitioner as his assailant, and as the individual who shot and killed one of the other victims, and pursued, beat, and killed the other victim. The petitioner has not, and cannot plausibly challenge the accuracy of Everett's identification of him and testimony about his crimes. That identification and testimony are, moreover, more than amply supported by physical evidence found at the scene and at and near petitioner's residence.

Of the welter of claims presented by the petitioner, only the following have not been foreclosed by procedural defaults:

First Claim: petitioner's confession;

Second Claim: petitioner's confession;

Third Claim: suggestive photo array;

Sixth Claim (Subparts A–E): indictment defects;

Eighth Claim: use of voter rolls re. venire;

Twelfth Claim: pre-death victim photos;

Fourteenth Claim: state's impeachment of its witness Sonya Barnes;

Seventeenth Claim (Subpart C): ineffective assistance of counsel re. failure to obtain grand jury testimony;

Nineteenth Claim: reasonable doubt instruction;

Twenty–Eighth Claim: post-verdict modification of verdict form;

Thirty–Eighth Claim: penalty phase instruction—death verdict recommendation;

Forty–Sixth Claim: merger of capital specifications;

Forty–Eighth Claim: tainting of jury by judge's comments.

Some of the remaining claims were not preserved in the trial court; others were not raised on direct appeal to the Ohio Supreme Court, though some were raised in the Court of Appeals. Whenever later raised, such claims were consistently held to be barred as a result of procedural default. The respondent's amended return of writ lists the defaulted claims in detail. (Doc. 111, at 69–71).

The petitioner does not contest the respondent's contention that his state court attorneys did not assert most of the claims as to which default is asserted in a timely manner. Instead, he asserts, as cause for the default, ineffective assistance of trial and/or appellate counsel.[1] However, as pointed out by the respondent, with the single exception of petitioner's seventeenth claim, asserting ineffective assistance for failure to obtain grand jury transcripts, all of petitioner's assertions of ineffective assistance of counsel are themselves fore-

---

**1.** Ineffective assistance of post-conviction counsel cannot be asserted as cause for a default attributable to such counsel. *Coleman* *v. Thompson,* 501 U.S. 722, 755–57, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Byrd v. Collins,* 209 F.3d 486, 515 (6th Cir.2000).

closed by procedural default. *See Stewart v. Smith,* 536 U.S. 856, 860, 122 S.Ct. 2578, 153 L.Ed.2d 762 (2002).

To overcome this default, the petitioner must show its cause, and, as well, resulting prejudice. This he has not undertaken to do: instead, he simply seeks to slide around the barrier to consideration of his defaulted claims on their merits by asserting in a conclusory manner that the failure to assert timely objection at trial, or assignments of error on appeal, constitute, without more, sufficient cause.

The default bar cannot, however, be side-stepped so easily. Although the Supreme Court held in *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), that ineffective assistance of counsel can constitute cause to excuse a default, the Court did not say that conclusory assertion of some unspecified inadequacy of a constitutional kind meets the cause requirement. *See Lott v. Coyle,* 261 F.3d 594, 608 (6th Cir.2001) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 691—92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (standard is whether counsel's error [*i.e.,* default] was so egregious as to render his assistance below that guaranteed by the Sixth Amendment).

To some extent, the petitioner seems to argue that any claim considered on the merits by a state court, despite the state court's noting of an antecedent default, can be considered on its merits in this court. Such claim laundering cannot occur, however, where the state court also found the claim to have been defaulted. Where an underlying default constitutes an adequate and independent basis for denial of a claim, concurrent merits review simply hammers in a second nail; it does not pry the default lid open. *See, e.g., Harris v. Reed,* 489 U.S. 255, 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (procedural default rule is based on longstanding "adequate and independent state ground" doctrine, whereby a federal law issue will not be considered on its merits if the state court ruled on a state-law ground that is both "independent" of the federal claim's merits and an "adequate basis for the court's decision").

Petitioner does not claim that the various findings of default on direct appeal and during the course of his two post-conviction proceedings fail to constitute independent and adequate state-law grounds, even where merits review has occurred. Thus, the respondent's claim of default as to all but the above-enumerated claims is well taken, and the defaulted claims will be dismissed on that basis.

Nonetheless, in addition to examining petitioner's non-defaulted claims on their merits, I will likewise examine defaulted claims, to the extent that they have any plausible or arguable basis whatsoever, on their merits.

With regard to claims reviewed on their merits, § 2254(d)(1) of the habeas corpus statute, 28 U.S.C. § 2254(d)(1), defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court: namely, where the state-court decision either (1) was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Absent that showing, relief from a state court's decision is not available in this court. None of the state court decisions on the merits of any of petitioner's claims—whether reviewed solely on their merits, or reviewed despite prior default.

## I. Grand Jury Composition and Selection—Claims 4, 5

■ The petitioner, who is African–American, claims that minorities were un-

der-represented on the grand jury (Claim Four) that returned the indictment against him and in the appointment as forepersons to grand juries in Trumbull County (Claim Five). Petitioner sought and was denied leave to conduct discovery with regard to these claims during the course of proceedings in this court.

Petitioner first asserted these claims in his second post-conviction relief petition, which was dismissed on the basis of procedural default, *i.e.*, untimeliness. That ruling was correct, and petitioner has not shown cause for the default. Indeed, petitioner's only argument in support of these claims is his contention that this court improperly precluded his request for discovery.

Petitioner is left to speculate about the reasons for disproportionate under-representation of minorities on the grand jury that returned the indictment against him because he failed to file a timely motion to dismiss prior to his trial. He has not shown that any such under-representation resulted from a race-based failure to follow Ohio's statutes and rules regarding the summoning and selection of grand jurors, systemic exclusion of minority grand jurors, or other constitutionally cognizable flaws. The same is equally true with regard to his challenge to the appointment of a Caucasian foreperson.

The petitioner is not entitled to relief on his Fourth and Fifth Claims.

## II. Defective Indictment—Claim Six, Subparts (A)-(E)

■ The petitioner claims that the prosecutor impermissibly divided single offenses into multiple charges, thereby enhancing the likelihood of conviction and imposition of the death penalty. Instead of being charged separately with two counts of aggravated murder as to each of the two victims, attempted aggravated murder as to the third victim, separate counts of aggravated burglary and robbery, and separate death specifications, petitioner claims that the temporal proximity of these offenses could constitutionally result only in a single charge (presumably, a single count of aggravated murder).

Review of this claim is not foreclosed by procedural default. There is, however, no merit to petitioner's contentions, which are not supported by citation to any federal constitutional principles or case law.

■ Such case law, in any event, makes clear that there was nothing constitutionally defective in the manner in which the petitioner was charged:

> When a defendant has violated two separate criminal statutes, the protection against double jeopardy [i.e., being subject to multiple convictions for a single offense] is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other. In making this assessment, the touchstone is whether the legislature intended to authorize separate punishments for the offensive conduct under separate statutes. The fact that both offenses arise out of a single criminal transaction is not dispositive. The critical question is "whether the 'offense'—in the legal sense, as defined by [the legislature]—complained of in one count is the same as that charged in· another."

*Aparicio v. Artuz*, 269 F.3d 78, 96 (2d Cir.2001) (citations omitted).

In this case, the Ohio courts concluded that the General Assembly intended to impose multiple punishments for the petitioner's offenses. This is a factual finding that is binding on this court. Each offense is distinct, with its own elements, and charging each separately is not foreclosed on the basis that any one is a lesser included offense of another.

■ The petitioner's contention that a violation of state law resulted from the trial court's failure to merge the offenses is not cognizable in this federal habeas corpus proceeding. *See, e.g., Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Clemmons v. Sowders,* 34 F.3d 352, 354 (6th Cir.1994).

Petitioner is not entitled to relief on Claim 6, Subparts (A)-(E)

### III. Petit Jury Composition and Selection Claims 8, 9, 10(A)-(E), 15, 17(B), 33(C) 50, 51

#### A. Selection of Petit Jury Venire—Claim 8

■ As noted by the respondent, petitioner's eighth claim, challenging the selection and composition of the trial jury, has not been defaulted. That claim contends that the Sixth Amendment right to a jury selected without regard to race was violated because the 131–person venire (of the 150 electors summoned on the basis of voter registration rolls) did not include any African–Americans. Had the venire mirrored the demographics of Trumbull County, nine members of the venire would have been African–American.[2]

■ To prevail on his claim of constitutional impropriety in the selection of his petit jury venire, petitioner must show that any under-representation resulted from systematic exclusion of African–Americans in the jury-selection process. *See generally Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Not having made a showing of mis- or malfeasance in the procedures used to summon the venire in his case, petitioner's claim founders on the bedrock

principle that, absent corruption of the process in the particular case, voter lists are a constitutionally permissible basis for summoning a jury venire. *See, e.g., United States v. Guy,* 924 F.2d 702, 707 (7th Cir.1991) ("voter lists are not an improper source from which to draw a pool of jurors" and "the federal courts that have addressed the constitutionality of voter registration lists unanimously agree that a state may constitutionally draw its jurors from voter lists."). *Accord, e.g., Truesdale v. Moore,* 142 F.3d 749, 755–56 (4th Cir. 1998) (use of voter registration lists for selection of juror pools passes constitutional muster).

■ The petitioner claims that the trial judge berated a prospective juror who expressed concern about the absence of African–Americans from the venire. This claim was raised on direct appeal and is exhausted. It is, however, without merit. Petitioner has not shown that the judge's response to the juror's inquiry exceeded constitutional bounds, or violated settled constitutional doctrine. Though brusque, the judge's statement that the juror should not concern himself about the propriety of the process by which jurors were summoned, and observation that the petitioner had capable counsel (*i.e.,* who could protect petitioner's rights against violation), were constitutionally permissible.

The judge's ensuing colloquy with that juror about his having breached an instruction not to discuss the case when the judge learned that the juror had spoken with a reporter about his concerns, and, as well, suggesting that the juror may have committed a contempt of court, were not improper. Obedience to a court's instruc-

---

2. It does not appear that the petitioner ever sought to determine the race of the nineteen persons who failed to respond to the summons. Failure timely to obtain this information, which is important, if not necessary to a full evaluation of petitioner's challenge to the venire-selection process, constitutes a procedural default. Nonetheless, his claim will be considered on its merits.

tions is a fundamental obligation; those who disregard instructions can properly be warned of the consequences.

Thus, with regard to petitioner's eighth claim, there has been no showing, as required by § 2254(d)(1) that the state court's rulings either (1) were "contrary to...clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Even if this incident violated the petitioner's constitutional rights, petitioner has not shown that it affected the outcome of his trial.

Petitioner is not entitled to relief on his Eighth Claim.

### B. Limitations of Scope of Voir Dire—Claim 9

█ Petitioner's Ninth Claim challenges the constitutional propriety of limitations imposed by the trial court on the scope of voir dire. The state Court of Appeals held that this claim was procedurally defaulted due to petitioner's failure to have objected to the limitations. Petitioner has not shown cause for or prejudice from his default, and the Ninth Claim is subject to overruling on that basis alone.

 Turning, nonetheless to the merits, the scope of voir dire, from a constitutional standpoint, is limited to determining if prospective jurors have any bias, opinion or prejudice that would affect fair determination of the trial issues. *See, e.g., Neely v. Newton,* 149 F.3d 1074, 1083–84 (10th Cir.1998) (*quoting Mu'Min v. Virginia,* 500 U.S. 415, 422, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)) (pre-AEDPA). To be constitutionally compelled, it is not enough that certain questions might be helpful; rather, the trial court's failure to ask these questions must render the defendant's trial

unfair. *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality); *Mayes v. Gibson,* 210 F.3d 1284, 1292 (10th Cir. 2000) (*citing Mu'Min v. Virginia,* 500 U.S. 415, 425–26, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)) ("In a petition for habeas, our inquiry into the conduct of voir dire is limited to whether the trial court's restriction on voir dire rendered the trial fundamentally unfair.").

Petitioner complains that the trial judge barred questions to the venire about religious preferences, the teachings of their religions, whether they were liberal or conservative, their views on the criminal justice system and capital punishment, and their opinion about particular mitigating factors. In addition, the petitioner complains that the trial judge interrupted his attorneys' voir dire, while not doing likewise during the prosecutor's voir dire.

These restrictions and actions during voir dire did not deprive the petitioner of a fundamentally fair trial. The petitioner is not entitled to relief on his Ninth Claim.

### C. Excused Jurors—Claim 10(C)

Petitioner's Claim 10(C) is that the trial court impermissibly excused prospective jurors on the basis of their views about the death penalty. This claim was procedurally defaulted, and is subject to dismissal on that basis alone. In this court the petitioner has failed, aside from unexplicated citations to the record, to explain, much less show persuasively that the trial court excused any jurors simply because they equivocated on the question of capital punishment. Equivocation is not the same as inability to impose a death sentence. *See generally Witherspoon v. Illinois,* 391 U.S. 510, 521, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ("a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they

voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction").

Petitioner is not entitled to relief on Claim 10(C)

### D. Prosecutor's Use of Peremptory Challenges—Claim 10(D)

■■■ Petitioner's Claim 10(D) asserts that the prosecutor improperly exercised peremptory challenges to exclude jurors expressing reservations about the death penalty. Even if this claim were not procedurally defaulted, petitioner is not entitled to relief. Absent a purpose to exclude minority jurors, a prosecutor can use peremptory challenges for whatever reason he may desire, or for no reason at all. *See, e.g., Gosier v. Welborn*, 175 F.3d 504, 509 (7th Cir.1999) (upholding prosecutor's use of peremptory challenges to remove "persons who seemed to be queasy about capital punishment").

Petitioner is not entitled to relief on Claim 10(D).

### E. Inaccurate Statements of Law/Refusal to Exclude Jurors—Claims 10(A), (B), (E)

■■■ The other aspects of Claim 10— that the trial judge made inaccurate misstatements of law during voir dire (Claim 10(A)), the prosecutor did likewise (Claim 10(B)), and the trial court improperly refused to excuse jurors who could not fully and fairly consider evidence in mitigation (Claim 10(E))—have all been procedurally defaulted. Even if they had not been, the petitioner has failed to show that he is entitled to relief. His claims are stated in a conclusory and cursory manner. They are unaccompanied by either description or discussion of the evidentiary record, case citation, or legal analysis. Even in a capital case, where a court's obligation to guard against error and prejudice is at its highest, it is incumbent on a petitioner to assist it in fulfilling that obligation by reciting the record, rather than merely citing to various pages of the transcript, and citing and discussing any pertinent authorities.

Nonetheless, on review of the record to which the petitioner points, I find no error, much less error contravening established federal constitutional precedent and doctrine. These remaining portions of petitioner's Claim 10 are without merit.

### F. Ineffective Assistance of Counsel During Voir Dire—Claims 17(B), (D), 33

Claim 17(B) and (D) and 33 assert that the defects in the voir dire process manifest ineffective assistance of counsel. There having been no constitutional deficiency during voir dire, counsel cannot be found to have performed inadequately during that phase of the trial. Thus, even if petitioner could overcome the default bar as to this claim, he could not prevail.

■■■ With specific reference to Claim 17(B): petitioner asserts that his lawyers provided ineffective assistance of counsel during voir dire because they did not address sentencing phase issues, did not ask about mitigating factors that would be offered on the petitioner's behalf, and failed to determine whether prospective jurors would automatically return a death verdict. These claims are barred by default.

■■■ Even so, in reviewing claims challenging the trial court's limitations on voir dire, a federal court on habeas review is "limited, of course, to such limitations that rise to the level of a constitutional violation." *Herman v. Johnson*, 98 F.3d 171, 174 (5th Cir.1996). As the Supreme Court pointed out in *Mu'Min v. Virginia*, 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), "the trial court retains great latitude in deciding what questions should be asked on voir dire."

■ With specific regard to a habeas challenge to the adequacy of counsel during voir dire, the Sixth Circuit has stated that "Counsel's actions during voir dire are presumed to be matters of trial strategy. 'A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'" *Miller v. Francis,* 269 F.3d 609, 615–16 (6th Cir. 2001) (citations omitted).

Petitioner has not called this court's attention to any cases in which the deficiencies which he lays at his trial counsel's door have been found to violate fundamental fairness. He is not entitled to relief on Claims 17(B), (D), and 33.

### G. Lack of Expert Assistance During Voir Dire—Claim 15, 17(A)

■ Claim Fifteen asserts that the petitioner's conviction and death sentence are constitutionally infirm because he did not have the assistance of a social psychologist to assist counsel during voir dire to evaluate the responses of the prospective jurors. Claim 17(A), in part, faults counsel for failing to obtain the services of a jury consultant. Claim Fifty and Fifty–One each assert, in part, that appellate counsel rendered constitutionally deficient service during petitioner's direct appeal to the Court of Appeals and Ohio Supreme Court, respectively, when he failed to assign as error the failure of trial counsel to procure the services of such consultant.

These claims are all procedurally defaulted, and the petitioner has not shown cause for the defaults.

In any event, the petitioner cites no cases to support his claims, probably because the duty to provide expert assistance or to seek to have such assistance provided does not reach nearly as far as petitioner claims. And, in any event, the failure to provide any and every form of such assistance that counsel might find helpful (or the failure to have sought such assistance) is not, without more, constitutionally unacceptable.

■ To be sure, in the context of psychiatric assistance, the Supreme Court held in *Ake v. Oklahoma,* 470 U.S. 68, 74, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), that such assistance may be "a basic tool of an adequate defense in two general circumstances: (1) 'when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial,' and (2) 'in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness.'"

The duty to provide (and to seek) such assistance arises when such assistance is part of the "raw materials integral to the building of an effective defense" and to give an indigent defendant to an adequate opportunity to present his claims fairly within the adversary system. *Mason v. Mitchell,* 320 F.3d 604, 614 (6th Cir.2003). Petitioner has not asserted, much less shown that such is an established component of federal constitutional law, that a jury consultant was a *sine qua non* of an effective voir dire.

Claims 15 and 17(A) are without merit, as are the claims of ineffective assistance of counsel based on those claims.

### IV. *Brady* Claim—Claim 7

Petitioner's Seventh Claim is that the prosecutor failed to disclose evidence favorable to the defense and material to the issue of guilt or innocence, in violation of the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ According to the petitioner, the following putatively exculpatory and

material items were known to, but not disclosed by, the prosecutor:

1. An eyewitness who saw the assailant drive the truck into the bridge, but who was not disclosed to the defense;

2. Details about a vehicle that may have been in the parking lot at the time of the murders were not disclosed;

3. Two of three eyewitnesses to the events near the bridge whose identities were disclosed gave somewhat conflicting descriptions of the assailant;

4. The prosecutor had extended an undisclosed benefit to Dwayne "Styx" Thomas; and

5. Other information bearing on Thomas' credibility was known to but not disclosed by the prosecutor.

Petitioner has never presented the specifics of this claim in any other proceeding in any court; it is, accordingly, defaulted, even though a generalized *Brady* contention was made in petitioner's second post-conviction relief petition and his *Murnahan* application in the Ohio Court of Appeals.

Nonetheless, on the merits, I conclude that there was no *Brady* violation with regard to several of the enumerated items because there was no concealment of anything about them. No one knows the name of the third eyewitness, much less what he might take away from (or, more likely, add to) the State's case. There was a passing allusion to a goldfish colored car during petitioner's interrogation at the police station shortly after his arrest—and then nothing more. That a car might be in a parking lot or otherwise in the vicinity of the crime scene is, to be sure, plausible. That it might have belonged to someone who saw something but who left is, though,

less plausible. That the owner/driver/occupant would have seen something useful to the petitioner is implausible. Most importantly, it is entirely impossible that whatever such individual might have said that was useful to the petitioner would have affected the outcome of the trial.

Petitioner's counsel was fully aware of the differing descriptions, and cross-examined the witnesses accordingly.

Dwayne "Styx" Thomas admitted he hoped he would get a helpful letter from the prosecutor in exchange for his testimony. There was, accordingly, no secret deal that was concealed from the petitioner and his attorneys. Thomas likewise was cross-examined extensively about his life in the drug world and his otherwise unattractive and unsavory background and character.

To the extent that, as the respondent anticipated in the amended return of writ, petitioner seeks, as he did at trial, to suggest that Thomas is the real assailant, such claim is unsupported by anything in the record. At most, the petitioner has submitted a set of questions about Styx's credibility in light of inconsistencies that he claims mar the reliability of his testimony.

Despite the lack of any substance to petitioner's *Brady* contentions, I ordered the respondent to submit the entire law enforcement and prosecutorial files for in camera review. On the basis of that review, I am satisfied that none of the petitioner's suspicions about hidden exculpatory evidence has any merit. In a word, what the State had, it presented at trial.

 Even if there had been something exculpatory, there can be no question that it would not have been material. The state's case rested on two extremely firm foundations: the account of John Everett, the petitioner's third victim, who saw what happened to his two co-workers, and bare-

ly escaped the same fate himself, and an extensive array of physical evidence found either on the petitioner, in his proximity, where or near where he lived, or left behind by him at the crime scene. The rest—the testimony of the passers by who saw the petitioner drive the company truck into the bridge and chase Everett, Styx, and the petitioner's girlfriend—was decoration. Even if all that had been impugned or impeached, there is, in light of the other, irrefutable evidence, no reasonable likelihood of any different outcome.

There is no merit to petitioner's *Brady* claim.

## V. Admission of Evidence/Trial Phase—Claims 1–3, 11–14, 16

Petitioner claims that decisions relating to the admission of evidence at his trial unconstitutionally tainted his conviction. He is entitled to prevail on none of these challenges.

### A. Post–Arrest Statements— Claims 1 and 2

 The petitioner claims that the State unconstitutionally extracted statements following his arrest, and then used those statements, over his objection, to convict him in violation of his Fifth, Sixth, Eighth, and Ninth Amendments. These claims have been preserved for habeas review.

The Ohio Supreme Court detailed the events leading to the petitioner's statements:

Davie contends that all the statements elicited from him by the police violated his right against self-incrimination. However, when Davie was arrested at his residence by Capt. Downs shortly after the murders, he was advised of his Miranda rights. At approximately 9:05 that morning, at the police station, Capt. Downs asked Lt. Carl Blevins to talk

with Davie, who was in an interrogation room. Lt. Blevins was joined by Det. Hill, who read Davie his Miranda rights. Davie initialed the rights form, but refused to sign the waiver. The officers did not question Davie further, but conducted an atomic absorption test on his hands. At no time did Davie request an attorney or indicate that he did not want to talk.

At approximately 9:59 a.m., Downs and Blevins reentered the interrogation room and interviewed Davie after again advising him of his Miranda rights. Davie denied that he had refused to sign the waiver form, but had simply been told by the officers that he did not have to. Davie then informed the officers that he did not wish to make a statement, and the interview ceased.

Later that morning, the prosecutor advised Sines that so long as Davie did not refuse to speak and did not demand an attorney, the officers could talk to him, provided that Davie acknowledged that he understood his rights. Therefore, Sines and Vingle had Davie brought up from his jail cell after Davie agreed to come up and talk.

At approximately 12:15 p.m., Davie was readvised of his Miranda rights and initialed each of his rights on the form, except the waiver of rights. He then signed the form, acknowledging that he understood his rights. Davie agreed to talk with the officers, and a short interview took place wherein Davie claimed that he did not remember being around the VCA that morning, but did have his gun with him. At 12:35 p.m., Davie indicated that he had nothing more to say, and the interview ceased. At approximately 2:00 that afternoon, Davie told Sgt. Massucci, who had been taking pictures of Davie, that he wished to talk to Det. Vingle. Davie was brought up

from his cell and was again advised of his Miranda rights by Sines and Vingle. Davie again initialed all the rights, except the waiver, but signed his name on the form. Davie then told the officers that he "went down to VCA and shot 'em up." Davie also admitted taking Jefferys's car and trying to run over Everett with the truck.

Contrary to Davie's arguments, he did not unequivocally assert his constitutional rights. Instead, he waived his right to remain silent during both interviews with Vingle and Sines, despite his failure to initial the waiver-of-rights portion of the form. This situation is similar to that in *State v. Scott* (1980), 61 Ohio St.2d 155, 15 O.O.3d 182, 400 N.E.2d 375, which followed the decision in *North Carolina v. Butler* (1979), 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286. In *Butler*, the Supreme Court noted that "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292. In *Scott*, the accused acknowledged that he understood his Miranda rights, but refused to sign a waiver form. Nevertheless, he agreed to answer questions and never requested counsel. The *Scott* court upheld the admissibility of the accused's statements and held, "[T]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in *Miranda* * * *." *Scott* at paragraph one of the syllabus. The similar facts of this case demonstrate that Davie * * * waived his *Miranda* rights even though he failed to initial the waiver part of the form.

When Davie indicated in his interview with Blevins and Hill that he no longer wished to talk, his requests were scrupulously honored by the officers. However, in cutting off the earlier interviews, Davie did not preclude a later interrogation by other officers. *See Michigan v. Mosley* (1975), 423 U.S. 96, 104, 96 S.Ct. 321, 326–327, 46 L.Ed.2d 313, 322. Moreover, Davie never asserted his right to have counsel present.

Finally, it is clear that Davie's 2:00 p.m. conversation with police, in which he implicated himself in the murders, was properly admitted, since he initiated that conversation himself. *See Edwards v. Arizona* (1981), 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387.

80 Ohio St.3d at 311, 319–20, 686 N.E.2d 245.

The Ohio courts overruled the petitioner's objections to the admission of his statements. The factual findings of those courts, as recited by the Ohio Supreme Court, are presumed correct, and have not been challenged by the petitioner. 28 U.S.C. § 2254(e)(1) (fact findings by state courts are presumed to be correct; burden is on the petitioner to overcome that presumption); *see generally Sumner v. Mata,* 449 U.S. 539, 549–51, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

The police made four efforts to interrogate the petitioner. Two were unsuccessful, one was partially unsuccessful and partially successful, and the last was successful.

The first effort occurred shortly after the petitioner's arrival at the station house following his arrest. After being advised of his *Miranda* rights, the petitioner declined to sign the waiver form. The officers, having other things to tend to, left the petitioner without having obtained a statement.

Within the hour, they returned. The petitioner stated he did not want to make a statement, though he did not ask to speak

with an attorney. The officers, who left, still had obtained no information.

About two hours later, other officers approached the petitioner. In the meantime, the prosecutor had advised the police that they could renew their approach to the petitioner, as long as he neither refused to speak with them nor asked for an attorney.

The petitioner declined again to initial the waiver of rights portion of the printed *Miranda* form. The petitioner told the officers that he did not remember being around the VCA that morning, though he did have his gun with him. After about twenty minutes, the petitioner told the officers he had nothing more to say, and the officers left.

About an hour and a half later, around 2:00 p.m., the petitioner sent word that he wanted to see one of the officers who had spoken with him earlier. He wanted to talk about the information being released to the media about himself and his girlfriend, and, as well, about the information provided to the police by Dwayne "Styx" Thomas.

The officers responding to this request renewed the *Miranda* warnings, and the petitioner signed the portions of the form indicating that he understood his rights. He again declined to initial the waiver portion. He then told the officers that he had gone to the VCA and "shot them up."

At trial, the petitioner testified that he had asked to speak with the officers because Dwayne "Styx" Thomas had threatened his girlfriend and petitioner's daughter. This, according to petitioner's trial testimony, impelled his statement acknowledging his role in the crimes later charged to him.

The Ohio Supreme Court held that petitioner's invocation of his right to remain silent during the first two attempts to question him had been "scrupulously honored" in accordance with the mandate of *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The Ohio Supreme Court also concluded that the statement obtained at the last interview was admissible under *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because the petitioner had initiated the conversation leading to the statement.

Petitioner's traverse appears to view this court's review of the admissibility of petitioner's statements as de novo. It is not: as a result of the amendments to 28 U.S.C. § 2254 et seq. by the Anti–Terrorism and Effective Death Penalty Act, federal review of state court judgments is strictly circumscribed. To obtain relief, the petitioner must, under 28 U.S.C. § 2254(d)(1), show that the decision of the state courts "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The determinative question with regard to petitioner's first two claims is whether the Ohio Supreme Court applied *Mosley* and *Edwards* in a way that was either "contrary to, or an unreasonable application of clearly established Federal law." It did not.

■■■ Under *Mosley* a court considers several factors when assessing whether officers scrupulously honored a suspect's invocation of his right to remain silent. 423 U.S. at 96, 96 S.Ct. 321. The first factor in the is whether the suspect was advised before the initial interrogation that he had the right to remain silent. Here, the warnings were given each time the officers

spoke with the petitioner. The second factor is whether questioning stopped immediately once the petitioner asserted his right to remain silent. It did: each of the first two sessions ended when the petitioner said he did not want to make a statement, and the third session ended when the petitioner said he had nothing more to say.

The third factor is whether the police waited a significant period of time after the petitioner's invocation of his right to remain silent before questioning him again. A significant period of time between interrogations does not require a durational minimum. *Compare United States v. Cody*, 114 F.3d 772, 775–76 (8th Cir.1997) (three hours was significant amount of time) *with United States v. Barone*, 968 F.2d 1378, 1385 (1st Cir.1992) (more than twenty-four hours was insufficient where police repeatedly pressured suspect to cooperate). The interval in *Mosley*, as it was in this case, was about two hours. 423 U.S. at 104–06, 96 S.Ct. 321

A "significant period of time" under *Mosley* is a function of the degree to which the police "persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him change his mind." 423 U.S. at 105–06, 96 S.Ct. 321.

It was not an unreasonable application of *Mosley* for the Ohio Supreme Court to conclude that the officers had not undertaken to wear the petitioner down. The initial sessions were brief, and there is no indication that the officers attempted to badger the petitioner, or cajole him into talking with him. There were no "good cop/bad cop" antics. There was no delay or hesitation in the termination of the interviews after the petitioner said he did not want to talk to the officers. There is no indication the officers withheld anything from the petitioner that he might have requested, such as something to eat or drink.

The fourth *Mosley* factor is whether the petitioner received fresh *Miranda* warnings before the interview leading to his statement. Renewed warnings preceded the afternoon session, during which the petitioner gave his incriminating statement.

The final *Mosley* factor is whether the final interrogation concerned a crime that was the subject of the first interrogation, as it did here. Where other factors indicate that a defendant's right to cut off questioning was "scrupulously honored," the mere fact that an interrogation involves the same crime as earlier interrogations does not automatically require exclusion of the petitioner's statement. *See, e.g., Weeks v. Angelone*, 176 F.3d 249, 268 (4th Cir.1999) (pertinent inquiry is not the subject of the later interview, but whether officers sought to undermine the suspect's desire to remain silent); *Hatley v. Lockhart*, 990 F.2d 1070, 1074 (8th Cir.1993) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview."); *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir.1988) ("an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional").

It would not have been unreasonable for the Ohio Supreme Court to conclude that the only factor weighing in the petitioner's favor under *Mosley* was the fact that all the sessions related to the same set of crimes. Thus, I conclude that that court's application of *Mosley* was not an unreasonable application of federal law. Nor was it contrary to Supreme Court precedent.

In any event, even if the Ohio Supreme Court's application of *Mosley* were unrea-

sonable or contrary to Supreme Court precedent, the petitioner was not prejudiced.

The decision in *Mosley* applies only to the second and third interviews, as the fourth interview resulted from a request from the petitioner to speak with one of the officers. No statement was obtained during the second interview.

The *Mosley* challenge is, accordingly, limited to the petitioner's noontime statement that he did not remember being around the VCA that morning, though he did have his gun with him. Admission of this statement could not have affected the outcome of the petitioner's trial. What could have been learned from that statement—that the petitioner had a gun with him that morning—was not new to either the officers or, ultimately, the jury. Thus, admission of the mid-day statement, even if improper, was harmless error beyond any doubt whatsoever.

I likewise conclude that the Ohio Supreme Court's determination that the afternoon statement was admissible under *Edwards* was neither unreasonable nor contrary to settled federal law.

The petitioner claims that his "limited request for information" about what the police were telling the media about himself and his girlfriend and what information that Thomas had provided to the police did not "initiate" further discussion about his case. (Doc. 148 [Petitioner's Traverse], at 13).

The leading case on what constitutes "initiation" under *Edwards* is the Supreme Court's 4–4 opinion in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In *Bradshaw* the defendant, after initially responding to an investigating officer's questions at a station house following an accident, stated that he wanted an attorney. Questioning

ceased. Later, as the defendant was being transported from the police station to the county jail, he asked, "Well, what is going to happen to me now?" The officer reminded the defendant that he did not have to talk with him, and that he didn't want the defendant talking to him unless it was of his own free will. The defendant thereafter made incriminating admissions.

Chief Justice Rehnquist, writing for the plurality, concluded that the defendant's inquiry initiated further conversation about his case:

There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have

been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that "you do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized conversation. Pet. 11. On these facts we believe that there was not a violation of the *Edwards* rule.

*Id.* at 1045, 103 S.Ct. 2830.

■ In *United States v. Whaley,* 13 F.3d 963, 967 (6th Cir.1994), the Sixth Circuit concluded that, in light of *Bradshaw,* "initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." It was not unreasonable—indeed, it was correct—for the Ohio Supreme Court to conclude that the petitioner had initiated further conversation about the case when he asked to speak to an officer about the information being given to the police and being obtained from Thomas. Such request manifests "a willingness and a desire to talk generally about his case" under *Whaley.* Petitioner has, therefore, failed to meet his burden of showing that the application of *Edwards* by the Ohio Supreme Court either (1) was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

Not having met this burden as to either *Mosley* or *Edwards,* the petitioner is not entitled to relief on his first or second claims.

### B. Pre–Trial and Trial Identifications— Claim 3

■ Officers displayed two photo arrays. One was assembled about an hour after the murders after Everett, the survivor, had named the petitioner as his assailant. The other array was put together about a week later. Different photos of the petitioner were used in the arrays. The first array included a photo taken by the police about a year before the shooting. The second array included a photo taken after the petitioner's arrest following the shooting.

Witness Donna Smith viewed the first array the morning of the shooting. She selected the petitioner's photo, and indicated that she was positive. About a week later, she again viewed the first array, and, as well, the second array. She selected the petitioner's photo from both arrays.

Petitioner claims that the arrays were suggestive because the persons depicted in the first array differed in age and facial hair and numbers written on the photos in the second array were in blue, whereas the number on petitioner's photo was black. Petitioner has preserved this claim for habeas review.

■ Due process is violated when an impermissibly suggestive pretrial identification procedure taints a later in-court identification with the risk of irreparable misidentification. *E.g., Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Here there was no impermissibly suggestive out of court identification. The mere fact that one photo has different ink is immaterial. Depiction of the petitioner in both arrays is not impermissible where different photos are used. The variations in age and facial hair are not so great that the witness's attention necessarily and unavoidably would have been focused on the petitioner's photo.

■ In any event, even if suggestiveness tainted the pretrial identifications, the

risk of misidentification, much less irreparable misidentification, was nil. Ms. Smith saw the petitioner for about fifteen seconds, looking directly at him, and he at her for part of that period. The opportunity for her to see him were excellent—daytime, no obstructions, no distractions, and close enough to see the whites of his eyes. The events Ms. Smith were witnessing were startling, and of the kind that would imprint themselves on one's memory.

Petitioner complains that Ms. Smith's initial statement to the officers did not include some of the details she later recounted. That does not matter—she gave her initial statement almost immediately after she witnessed the incident to officers who were just beginning to respond to the crimes and beginning their investigation. There is no reason whatsoever to believe that Ms. Smith later fabricated any of the details.

Petitioner has not met the requirement of § 2254(d)(1) that he show that the state court ruling as to this claim either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

There is no merit to petitioner's third claim for relief.

### C. Depictions of Victims—Claim 11

■ Petitioner claims that his trial and appellate counsel provided ineffective assistance when the former did not prevent, and the latter did not challenge on appeal, the admission of photos and videos of the crime scene, the coroner's report, and autopsy slides and diagrams. In addition to complaining about the generally gruesome nature of much of these materials, the petitioner claims that the number of the photos and other depictions was unduly repetitive and thus unfairly prejudicial.

This claim is barred by procedural default. It is also without merit.

Defense challenge to about half of the autopsy slides was successful. Other items, about which petitioner now protests, were used by him in his unsuccessful effort to blame Dwayne "Styx" Thomas.

"For the Petitioner to prevail on [this claim], he must demonstrate that the admission of the photographs at trial deprived him of a fundamentally fair trial", *Jackson v. Anderson,* 141 F.Supp.2d 811, 840 (N.D.Ohio 2001), and that his attorneys' failure to secure the exclusion of more, if not all of this material denied him his Sixth Amendment right to effective assistance of counsel.

■ As a general rule, a challenge to admission of crime scene and similar victim-related photos fails to state a constitutional claim, and thus is not cognizable in a habeas proceeding. *Cooey v. Coyle,* 289 F.3d 882, 894 (6th Cir.2002) (citing *Gerlaugh v. Stewart,* 129 F.3d 1027, 1032 (9th Cir.1997) (holding that the claim that a gruesome photo of decedent was erroneously admitted did not raise "the spectre of fundamental fairness such as to violate federal due process of law")). The petitioner in this case, like the petitioner in *Sparks v. Foltz,* 1988 WL 46249, *7 (6th Cir.) (Unpublished Disposition), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989), "cites to no cases which have held that the introduction of gruesome photographs violates due process." And, as in *Smith v. Smith,* 1998 WL 764761, *2 (6th Cir.) (Unpublished Disposition), "there is nothing in the record to indicate that had the jurors not seen the photographs, doubt as to guilt could have arisen."

Petitioner is, accordingly, not entitled to prevail on his eleventh claim for relief.

### D. Pre–Homicide Photos of Victims—Claim 12

▇ Pictures of the murder victims while they were alive were introduced at petitioner's trial. Petitioner has preserved this claim for habeas review.

Though such pictures may have had questionable relevance, their admission did not deprive the petitioner of a fundamentally fair trial, nor were they likely to have led to a conviction that otherwise would not have been returned. Petitioner has not shown, as required by § 2254(d)(1), that the state court's ruling on this claim either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

There is *no merit* to petitioner's twelfth claim.

### E. Cross–Examination of Petitioner re. Other Acts—Claim 13

▇ Petitioner testified at trial. The prosecutor asked him on cross-examination about his having been expelled from school, departure for California while his girlfriend was pregnant, failure to support his child or its mother, and the mother's seeking assistance from the county welfare department. In addition, the prosecutor asked the petitioner whether he had stalked any VCA employees.

Petitioner contends that examination into these matters placed him in an unconstitutionally prejudicial bad light, exposing him to conviction on the basis of his character, rather than his conduct on the date of the killings. This claim is barred by default.

▇ It also has no merit. "Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir.1994). The Ohio Supreme Court found that any error in the admission of the evidence challenged in this claim was harmless beyond a reasonable doubt. Petitioner has not shown that this ruling either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

In view of the overwhelming evidence of the petitioner's guilt, and the implausibility of his unavailing effort to implicate Dwayne "Styx" Thomas, the introduction of the challenged evidence could, in any event, have had no impact on the outcome of the trial.

There is no merit to petitioner's thirteenth claim.

### F. Impeachment of Sonya Barnes—Claim 14

▇ Shortly after the shootings, petitioner's girlfriend (and mother of his daughter), Sonya Barnes, informed the police that the petitioner had come to her house that morning with bloody clothes, and told her that he was in trouble and some people had been shot. At trial, called as a prosecution witness, Barnes testified that Dwayne "Styx" Barnes had also come to her house, drawn a gun and demanded money from the petitioner. In her initial statement, Barnes had said nothing about Thomas's actions.

Petitioner preserved this claim for habeas review.

Barnes' testimony in that respect was impeached through questions about her failure to have said anything about Thomas in her original statement. The Ohio Supreme Court found no error under state law. Certainly this routine mode of cross-examination did not deprive the petitioner of a fundamentally fair trial. Petitioner has not shown that the ruling by the Ohio Supreme Court either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

Petitioner's fourteenth claim is without merit.

### G. Failure to Appoint Pathologist— Claim 16

Petitioner has withdrawn this claim for relief.

## VI. Ineffective Assistance of Counsel/Trial Phase— Claims 17(A), (C), (D)

Petitioner contends that his constitutional right to effective assistance of counsel was not fulfilled at the guilt phase of his trial due to inadequate investigation, ineffective cross-examination, and other unspecified defects of omission or commission. These claims have been preserved for habeas review.

### A. Investigation

■ Petitioner contends that further investigation would have led his attorneys to putative witnesses who would have provided information about Dwayne "Styx" Thomas and his alleged drug dealing. Petitioner also claims that additional investigation would have led to other potential witnesses and evidence. Restrictions on discovery in this habeas proceeding, petitioner asserts, have limited his ability to develop the record with regard to what

would have been uncovered had such investigation occurred.

Based on my in camera review of the police and prosecutors' files, it is clear that there is nothing in those files which, had they been available to petitioner's trial court counsel, supports any of the petitioner's contentions.

The fact, if it was such, that Dwayne "Styx" Thomas was a drug dealer, had a gun, and threatened the petitioner after the shootings has not been shown to have any connection whatsoever with the crimes of which the petitioner was convicted. In addition to the overwhelming evidence that petitioner committed the murders, and did so on his own, there is nothing, on the other hand, to give rise to any reason whatsoever to believe that the killings were drug-related, or that anyone else played any part in them.

With regard to the balance of petitioner's contentions that further investigation should have occurred, he has failed to show, or even suggest, what such investigation would have uncovered or how it would have affected the outcome of his trial. Having failed to support his conclusory allegations with any factual basis, he cannot prevail on that aspect of his claim.

The further investigation that petitioner now contends should have occurred would have been a waste of time.

Petitioner has, in any event, failed to show that the state court ruling on this claim either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

There is no merit to the petitioner's contention that the pretrial investigation was insufficient. In any event, any lapse

in that regard had no prejudicial outcome at the trial.

### B. Ineffective Cross–Examination

■ The petitioner alleges that cross-examination was insufficient due to nondisclosure of information by the prosecution and inadequate investigation by counsel. No nondisclosure occurred, and the petitioner has not shown that any potentially worthwhile, but unexplored investigatory avenues existed.

■ As a general rule, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir.2002) (*quoting United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987)); *see also United States v. Steele,* 727 F.2d 580, 591 (6th Cir.1984) (cross-examination fell "within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court. An attorney must be free to determine questions of trial strategy.").

Petitioner's criticisms of his attorneys' performance fail to show how his right to fundamental fairness was denied to him. The cross-examination was, under all the circumstances, capable and professional. Petitioner, moreover, has failed to show prejudice from any deficiencies in cross-examination.

Likewise, the petitioner has failed to show that the state court rulings either (1) were "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

### C. Catchall Ineffective Assistance

The petitioner recites several other omissions on the part of his trial attorneys.

■ The petitioner contends that defense counsel failed to call two persons who knew petitioner and Dwayne "Styx" Thomas. According to the affidavits of these individuals, Thomas was a drug dealer and petitioner was to sell drugs for him, but used the drugs and owed Thomas money. The affiants also stated that petitioner loved his daughter, was a hard worker, and was frustrated at not being able to get a job.

None of that information is exculpatory. To the extent that it was positive, it was already in the record from other, and more likely more credible, witnesses. To the extent that the information was negative— which much of it was—it would hardly have been helpful.

What witnesses to call is a matter reserved for counsel's discretion and judgment. *See, e.g., United States v. Foreman,* 323 F.3d 498, 504 (6th Cir.2003). There is nothing in the affidavits of the putative witnesses to suggest that the decision not to present their testimony was anything other than reasonable. That decision certainly did not fall beneath a standard of reasonable competence.

■ Petitioner faults his attorneys for waiving his attendance at an in camera voir dire of the jurors after the court learned that some of the jurors had been in the clerk's office when some of the victim's family members were being interviewed following the guilt phase of the trial.

■ "Under federal law," as the Second Circuit stated in *Clark v. Stinson,* 214 F.3d 315, 321 (2d Cir.2000), "the defendant's presence at trial is required 'to the extent that a fair and just hearing would

be thwarted by his absence, and to that extent only.' Under this standard, the defendant's absence is reversible error only where it would have a 'relation, reasonably substantial, to his opportunity to defend.'" *Id.* (*quoting Snyder v. Massachusetts,* 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.), *overruled on other grounds, Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). In *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Supreme Court found no error where a defendant did not attend an in camera session between a juror and the trial judge: "the presence of the four respondents and their four trial counsel at the in camera discussion was not required to ensure fundamental fairness or a 'reasonably substantial ... opportunity to defend against the charge.'" (*citing Snyder, supra*).

Counsel's waiver of petitioner's attendance did not fall below constitutionally acceptable norms of representation. Even if it did, petitioner has not shown prejudice, as his attendance at the voir dire of the jurors about the incident in the clerk's office would have added nothing to the course, scope, or outcome of those proceedings.

Petitioner claims his trial attorneys failed to preserve meritorious issues for appellate review. As discussed elsewhere in this opinion, none, or almost none of the so-called meritorious issues was in fact such. Thus, the failure to preserve those issues for later review did not reflect constitutionally unacceptable representation.

There was, for example, nothing improper in the trial court's request to the jurors to remain seated while the petitioner was taken from the courtroom. That request on the judge's part was within the scope of his discretion to maintain order in the proceedings.

Admission of so-called other acts evidence relating to petitioner's expulsion from school, sojourn in California while his girlfriend was pregnant, failure to support his family following his return (requiring his girlfriend to seek public assistance), and possible stalking of VCA employees was not error. One of the aggravating circumstances was robbery, and elicitation of testimony about the petitioner's trip to California (where he obtained employment) and nonsupport of his child show motive to rob. The alleged stalking of his coworkers was related to the element of prior calculation and design in the murder charges.

Ohio's "[r]eviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners" because a "decision whether to object to the admission of evidence is a trial tactic, which should not be second guessed on appeal." *State v. Seibert,* 2003 WL 21386293, *3 (Ohio App.). Petitioner's counsel could well have determined that more would have been lost, in terms of the impression created on the jury, if they were to have objected to this testimony (and suggested subliminally, at least, that their client had something to hide).

Even if this evidence was not admissible (as was, it would appear, testimony during the guilt phase about petitioner's school record), and counsel should have objected, there can be no doubt that reviewing courts would have concluded that it did not affect petitioner's substantial rights. Thus, petitioner was not prejudiced by any oversight on the part of his attorneys when this evidence came in.

 With regard to allegations of prejudice from prosecutorial misconduct, in Ohio,

The test for prosecutorial misconduct is whether the remarks made by the prosecution were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id., quoting Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181[, 767 N.E.2d 166], 2002–Ohio2128, ¶ 121

*State v. Lamb*, 2003 WL 21686419, *2 (Ohio App. 12 Dist., Jul. 21, 2003).

As discussed in the following section, there is no merit to the petitioner's claims of prosecutorial misconduct. The prosecutor's comments, even if objectionable (which petitioner has not established by citation of relevant Ohio or federal case law) about the nature of the American criminal justice system and the crime, negative comments about the arguments being advanced by defense counsel, and failure of the defense expert to testify (a matter of which the jury was already well aware) did not render petitioner's trial fundamentally unfair. Had an objection been made and the issue preserved for appeal, the conviction would not have been reversed.

None of the actions or inaction of counsel asserted in Claim 17(D) as manifesting ineffective assistance of counsel have merit.

## VII. Prosecutorial Misconduct/Trial Phase—Claim 18

The petitioner alleges several instances of prosecutorial misconduct during the trial. Among these are: 1) references in his opening statement to truth and justice, and the positive qualities of the American system of justice and in both opening and closing statements to the horrific nature of the killings and appearance of the victims after the shootings; 2) negative comments about defense counsel and their tactics; 3) comments on the failure of an expert retained by the defense to testify; and 4) knowing use, through the testimony of Dwayne "Styx" Thomas, of false and perjured evidence.

Consideration of these claims is precluded by petitioner's procedural default.

■■■■ In any event, the petitioner's claims are not well-taken. A claim of prosecutorial misconduct does not require habeas corpus relief unless the prosecutor's conduct was so egregious as to render the trial fundamentally unfair. *E.g., Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1355–56 (6th Cir.1993). Thus, as the Sixth Circuit recently noted in *Mason v. Mitchell*, 320 F.3d 604, 634–35 (6th Cir.2003):

The relevant question in cases of alleged prosecutorial misconduct is "'whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "[T]he misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir.2000) (internal quotation marks and citation omitted). A claimant must establish that the challenged statement was both improper and so flagrant as to require reversal. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000). We have

previously identified four factors that are relevant in analyzing a claim of prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether they were deliberately or accidentally placed before the jury[;] and the strength of the competent proof to establish the guilt of the accused.

*Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir.1999) (quotation omitted).

■ The prosecutor's comments about the nature of the American criminal justice system and the crime, negative comments about the arguments being advanced by defense counsel, and failure of the defense expert to testify (a matter of which the jury was already well aware) did not render petitioner's trial fundamentally unfair.

There is no basis for the contention that the prosecution relied on perjured testimony. To the extent that this claim rests on materials that the petitioner has not been able to examine, it is without merit, in view of the in camera inspection of the police and prosecutor files conducted by the undersigned.

Petitioner's Claim 18 is without merit.

## VIII. Jury Instructions/Trial Phase—Claims 19–28

Petitioner challenges the constitutional validity of nine instructions given during the guilt phase of his trial. All but one of those claims (claim nineteen) are precluded by procedural default.

Petitioner also claims that correction of a typographical error on the aggravated robbery verdict form was constitutionally improper. This claim (twenty-eight) has been preserved for habeas review.

■ With specific regard to a habeas challenge to jury instructions, a petitioner has, in any event, a particularly heavy burden: "In a habeas proceeding, allegedly improper jury instructions must be shown to have infected the accused's trial to such a degree as to constitute a clear violation of due process. The petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned." *Wood v. Marshall*, 790 F.2d 548, 551 (6th Cir.1986); *see also Coe v. Bell*, 161 F.3d 320, 329 (6th Cir.1998).

■ The Ohio Supreme Court found no error in the instructions encompassed by the petitioner's nineteenth claim, which challenges the definition of reasonable doubt. The petitioner has not shown that this ruling either 1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." This definition has been held in the context of a capital habeas proceeding not to violate due process. *Coleman v. Mitchell*, 268 F.3d 417, 436 (6th Cir.2001).

■ The same is true with regard to the twenty-eighth claim, where the Ohio Supreme Court found no prejudice from the interlineation, after the verdicts had been returned, of a verdict form to correct a typographical error. The petitioner has not shown that this ruling either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

The remaining challenges to guilt-phase jury instructions are barred by procedural default. In any event, they either conflict

with prevailing law or the petitioner has not met his burden of showing that the allegedly erroneous instructions either (1) were "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

 The petitioner's twentieth claim is based on the fact that the trial court failed to instruct the jury about the unreliability of eyewitness testimony. This claim was not asserted until petitioner's second post-conviction relief petition. It is, accordingly, defaulted.

In any event, refusal to give such instruction, particularly in the context of a case in which the eyewitnesses included a co-worker and the physical evidence pointed indubitably at the petitioner did not violate fundamental fairness. *See Buell v. Mitchell,* 274 F.3d 337, 365 (6th Cir.2001); *Love v. Young,* 781 F.2d 1307, 1318 (7th Cir.1986); *see also Riggins v. Turner,* 1997 WL 144214 (6th Cir.) (Unpublished Disposition) (failure to request eyewitness instruction not ineffective assistance of counsel). There is no merit to the petitioner's twentieth claim.

 The twenty-first claim is that the trial court improperly gave an instruction as to aider and abettor/accomplice culpability. The state appellate court held in its review of the dismissal of petitioner's *Murnahan* petition that this instruction had been a proper response to the petitioner's contention during his defense that Dwayne "Styx" Thomas had committed the murders. (Doc. 110 [Appendix to Return of Writ], at 110–11).

Petitioner has not cited any cases in support of his claim, much less shown that the finding of the state Court of Appeals of

no error in the giving this instruction either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

In any event, this instruction did not deprive the petitioner of fundamental fairness, or otherwise so infect the petitioner's "trial to such a degree as to constitute a clear violation of due process." *Wood v. Marshall,* 790 F.2d 548, 551 (6th Cir.1986). The petitioner's twenty-first claim is without merit.

 Petitioner's twenty-second claim is that the instruction on the multiple murder capital specification under O.R.C. § 2929.04(A)(5) was improper, in that it stated that conviction could be based on a finding that a reasonable person, rather than the petitioner himself, would have foreseen the consequences of his actions. This claim, raised for the first time in the second post-conviction relief petition, is defaulted.

In any event, petitioner cites no cases in support of this contention. I conclude that this instruction did not deprive the petitioner of fundamental fairness, or otherwise so infect the petitioner's "trial to such a degree as to constitute a clear violation of due process." *Wood v. Marshall,* 790 F.2d 548, 551 (6th Cir.1986). Petitioner is not entitled to relief on his twenty-second claim.

The twenty-third claim is that the trial judge relieved the prosecution of its burden of proving that the petitioner acted purposefully, as required by O.R.C. § 2903.01(A), which provides that "No person shall purposely, and with prior calculation and design, cause the death of another ...." This claim was not raised until the

*Murnahan* petition. The appellate court held that the claims in that petition were defaulted due to its untimeliness. In any event, the claim was defaulted due to petitioner's failure to object to this instruction.

 Despite the default, the appellate court reviewed the merits of the claim, and held that the instruction had been proper. (Doc. 110 [Appendix to Respondent's Return of Writ], at 108–09). Petitioner does not point to a constitutional basis for his allegation. His claim is, accordingly, based on an alleged mis-application of state law. Such claims are not cognizable in a habeas proceeding. *See Buell v. Mitchell,* 274 F.3d 337, 356 (6th Cir.2001) (state law errors in instructions not cognizable in habeas proceeding). In addition, petitioner has not shown that the decision of the state Court of Appeals finding no error in the giving this instruction either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

The twenty-fourth claim is that the court improperly instructed the jury as to the elements of aggravated burglary. Raised first in the second post-conviction relief petition, this claim is defaulted.

Petitioner does not point to a constitutional basis for his allegation. His claim is, accordingly, based on an alleged mis-application of state law. Such claims are not cognizable in a habeas proceeding. *Buell, supra.*

There is no merit to petitioner's twenty-fourth claim.

 The twenty-fifth claim is that the trial court erred when it instructed the jury that it could only consider the lesser included offense after it had found the petitioner not guilty of the greater offense. The Ohio Supreme Court held that this claim was procedurally defaulted. 80 Ohio St.3d at 323, 686 N.E.2d 245. It also concluded that the petitioner suffered no prejudice from any error in this instruction, because the counts to which it related (three and four) had been dismissed by the trial court. *Id.* at 324, 686 N.E.2d 245.

The petitioner has not shown that this ruling either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

There is no merit to petitioner's twenty-fifth claim.

 The twenty-sixth claim is that the trial court failed to require unanimity with regard to which of the three underlying felonies the petitioner had committed as a predicate to aggravated murder. The Ohio Supreme Court held that this claim was defaulted because no objection to the instruction had been made in the trial court. *Id.* at 323, 686 N.E.2d 245.

That court held, moreover, that the issue was moot, in view of the dismissal of the counts (three and four) to which it related, and that the petitioner, in any event had suffered no prejudice, because the jury found him guilty of all three underlying felonies. *Id.*

The petitioner has not shown that these rulings either (1) were "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

The petitioner is not entitled to relief on Claim 26.

## IX. Tainted Jury—Claims 29, 48

Petitioner claims that the jury at his trial was prejudicially affected by exposure to extraneous events: 1) expressions of bias or guilt by the trial judge; and 2) observation of members of the victim's family being interviewed after the guilt-phase verdict.

### A. Judicial Expressions of Bias/Guilt—Claim 48

■ Petitioner claims that two statements, allegedly made in the jury's presence, constituted expressions on the trial judge's part of bias and guilt.

The first occurred during a sidebar conference, when the judge used the term "confession" during the discussion. The purpose of the discussion was to determine how the petitioner's statement in which he confessed to the crimes should be described to the jury (i.e., as a "statement" or as a "confession"). At the end of the conference, the trial judge told the jury that it was up to them to decide whether to call the statement a confession.

This contention has been preserved for habeas review. The court, finding no merit to the contention, stated:

Davie further contends that his rights were infringed when the trial court characterized his voluntary statement to police officers as a "confession." This characterization was made off the record. The trial judge instructed the jury that only it could determine whether Davie's statement was a confession. Thus, even assuming that the jury heard the judge refer to the statement as a confession, this court will presume that the jury followed the judge's curative instruction.

*Id.* at 317, 686 N.E.2d 245.

■ The judge made the second statement as court was adjourning. He said to the jury, "I would ask everyone to remain seated until the deputies have an opportunity to take Mr. Davie out of the room. Please return tomorrow morning at 9.00."

The second contention is barred by default. As the Ohio Supreme Court noted, there had been no contemporaneous objection to the judge's instruction to the jurors to remain seated. 80 Ohio St.3d at 316, 686 N.E.2d 245. On the merits, the court, in any event, found no deprivation of the petitioner's substantial rights: "The comment in issue was brief, isolated, and not prejudicial. The trial court's direction to the jury to remain seated did not rise to the level of the 'constant reminder' of prison garb or shackles." *Id.*

The petitioner has not shown that these rulings either (1) were "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

The petitioner is not entitled to relief on Claim 48.

### B. Jurors' Observations of Victims' Families Following Guilt–Phase Verdict—Claim 29

■ Petitioner contends that some jurors observed some of the members of the victims' families being interviewed by media representatives following the guilt-phase verdict. Those observations occurred from a distance of about fifteen to twenty feet in the Clerk's office, where the jurors had gone to receive payment for their services. The prosecutor observed the circumstances, and informed the court that no juror approached the group being interviewed. He also expressed the view that "unless you get close to these people,

you can't even hear what the conversation is about." (Sent. Tr. 7).

When the situation was brought to the trial judge's attention, the judge, denying a request by petitioner's counsel for a more extensive inquiry, asked each juror simply whether anything had happened since the last time in court "that would not permit you to continue to sit as a fair and impartial juror during this penalty phase?"

I agree that the trial judge's inquiry was cursory, and could have been more fulsome. That probably would have ended the matter, especially if the judge gave an appropriate cautionary instruction. *See United States v. Clark*, 184 F.3d 858, 870 (D.C.Cir.1999) (risk of prejudice from possible viewing of television program avoided by timely cautionary instruction).

In light of the prosecutor's description of the scene, it is not likely that anything said by the family members to media interviewers could have been heard by any of the jurors. In addition, there is no reason to believe that either the interviewer or interviewees could have communicated information about the petitioner bearing on the issues to be adjudicated at the penalty phase. Thus, it is even less likely that anything the jurors could have heard or seen could or would have affected their verdict during the penalty phase.

I conclude, accordingly, that the petitioner's right to fundamental fairness was not affected by the trial court's failure to have engaged in a more penetrating voir dire of the jurors following their possible exposure to statements by family members to media interviewers.[3]

There is no merit to petitioner's twenty-ninth claim.

## X. Admission of Evidence, Penalty Phase—Claims 30, 31, 32

Petitioner contends that prejudicial errors of a constitutional dimension occurred at the penalty phase, including: improper preclusion of psychological evidence (Claim

---

**3.** The petitioner complains that his right to be present at all stages of the proceedings was denied when he was not present when the jurors were questioned individually in camera by the trial court. (Claim 49). This claim fails because: 1) first raised in petitioner's post-conviction proceedings, it was held procedurally barred and 2) petitioner's counsel waived his attendance, *see Clark v. Stinson*, 214 F.3d 315, 321 (2d Cir.2000); and, 3) in any event, "under federal law ... the defendant's presence at trial is required 'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' Under this standard, the defendant's absence is reversible error only where it would have a 'relation, reasonably substantial, to his opportunity to defend.' " *Id.* (*quoting Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.), *overruled on other grounds, Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). *Accord United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) ("the presence of the four respondents and their four trial counsel at the in camera discussion was not required to ensure fundamental fairness or a 'reasonably substantial ... opportunity to defend against the charge.' ") (*citing Snyder, supra*). Petitioner's attendance at the voir dire of the jurors about the incident in the clerk's office would have added nothing to the course, scope, or outcome of those proceedings. His constitutional right to attend was not abridged as a result of his absence.

Petitioner references, but does not discuss, his absence from a jury view. In *Snyder, supra,* the Supreme Court held that the defendant's due process rights were not violated when he did not attend a jury view. 291 U.S. at 103, 54 S.Ct. 330, 78 L.Ed. 674 (1934). A jury "viewing is not a 'trial' nor any part of a trial in the sense in which a trial was understood at common law." *Id.*

The Third Amended Petition refers to other instances in which the petitioner was not present for proceedings. His traverse does not discuss those other instances, thereby waiving any claim he might have in relation to them.

30(A)); limitation on consideration of petitioner's youth at the time of the crimes as a mitigating factor (Claim 30(B)); failure by the trial judge to provide a neurologist to conduct a CAT scan and MRI (Claim 31); and failure to provide a clinical psychologist with enough experience to be useful at the penalty phase of petitioner's trial. (Claim 32).

### A. Limitation of Evidence/Factors at Penalty Phase Hearing— Claim 30

#### 1. Voir Dire Inquiries re. Petitioner's Youth

■ The petitioner claims that the prosecutor's inquiry on voir dire about the ability of the jurors to return a death verdict, despite the petitioner's age at the time of the crimes (nineteen), caused them to be preconditioned against giving due consideration to the petitioner's youth.

This claim was procedurally defaulted: there was no objection to the prosecutor's questions, and petitioner did not raise this issue until his *Murnahan* petition, which was overruled on the basis of untimeliness. The court concluded, despite the default, that the questions were permissible.

The petitioner has not shown that this ruling either (1) was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." In any event, it does not appear that the prosecutor's inquiry was improper. *See Sellers v. Ward,* 135 F.3d 1333, 1341 (10th Cir.1998) (not improper to prevent defendant from asking if jurors would consider youth as a mitigating factor while allowing prosecutor to ask whether jurors would be offended by request for death penalty for a seventeen-year old defendant).

### 2. Limitation of Defense Examination of its Expert

The petitioner called Dr. John Kenny, a neuropsychologist, who testified, *inter alia,* about post-concussion syndrome (the petitioner having been hit by a baseball bat some years before the events leading to his prosecution). The prosecution objected to questions by petitioner's counsel as to whether, in his opinion, the petitioner would have been aware his injury or able to control what the injury was. After an unrecorded sidebar, the petitioner's counsel took up a different line of inquiry. An objection to an earlier rephrasing of the question had been sustained on the basis of lack of foundation.

The Ohio Supreme Court held that this claim was barred by procedural default due to a lack of a proffer. 80 Ohio St.3d at 327, 686 N.E.2d 245.

■ This was nothing more than a ruling on the admissibility of evidence. Such rulings generally are not cognizable in a habeas corpus proceeding. *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir.1994)("Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."). This ruling did not affect the petitioner's right to a fundamentally fair trial, much less perniciously so.

There is no merit to petitioner's thirtieth claim.

### B. Failure to Provide CAT Scan and MRI—Claim 31

■ Petitioner contends that a CAT Scan and MRI should have been ordered by the trial judge. He makes this claim in the face of his own expert's decision not to employ these diagnostic devices. The state courts, which considered this claim as part of petitioner's first post-conviction re-

lief petition, held that he had failed to show the existence of an injury that would have been detectable by a neurological examination. *State v. Davie*, 1998 WL 684157, *6 (Ohio App.).

The petitioner has not shown that this ruling either (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." In any event, petitioner's own expert not having believed that either a CAT scan or MRI was justified, this court cannot find constitutional fault on the part of the state trial judge for his failure to order that such examinations be conducted.

There is no merit to petitioner's thirty-first claim.

### C. Failure to Secure Additional Psychological Evaluations— Claim 32

■ A defense expert, Dr. James L. Brown, described petitioner's developmental history as "rather benign." That assessment, petitioner contends, was inaccurate, and Dr. Brown's evaluation was incomplete. He faults the trial court's failure to have made arrangements for him to obtain additional psychological evaluations.

This claim, insofar as it seeks relief on the basis of the trial judge's failure to have appointed additional experts *sua sponte*, is raised for the first time in this habeas proceeding. It cannot be considered in this proceeding because petitioner has not met the threshold requirement of § 2254(b) that he exhaust state remedies. *See generally Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (exhaustion of state remedies is a prerequisite to habeas review, because

state courts must have an opportunity to correct errors of constitutional dimension).

In any event, this claim is without merit. Just as an attorney is not "required to shop for a more favorable expert", *Walton v. Angelone*, 321 F.3d 442, 466 (4th Cir. 2003) (citation omitted), the trial judge is not required to do such shopping for him.

Petitioner is not entitled to relief on his thirty-second claim.

### XI. Ineffective Assistance of Counsel During the Penalty Phase— Claim 33

The petitioner faults the performance of his attorneys at the penalty phase in several respects:

A. Insufficient investigation;

B. Failure to obtain necessary and competent experts

C. Inadequate voir dire;

D. Failure to present available mitigation evidence; and

E. Failure to object to improper jury instructions

The Ohio Supreme Court reviewed petitioner's death sentence, and summarized the evidence in aggravation and mitigation:

After independent assessment, we find that the evidence supports beyond a reasonable doubt that Davie murdered John Coleman and Tracey Jefferys with prior calculation and design. The evidence also supports beyond a reasonable doubt the aggravating circumstances that Davie murdered Coleman and Jefferys and attempted to kill Everett as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. R.C. 2929.04(A)(5). In addition, the evidence supports beyond a reasonable doubt that Davie murdered Coleman and Jefferys while committing aggravated robbery, aggra-

vated burglary, and kidnapping. R.C. 2929.04(A)(7).

The nature and circumstances of the offense are not mitigating. On the morning of June 27, 1991, Davie went to the business premises of VCA, from which he had been fired, and made an unauthorized entry while carrying a gun. He rounded up the three VCA employees present that morning and shot two of them, killing one instantly. When his gun ran out of bullets, he chased down the office secretary and bludgeoned her to death. When Everett was able to escape the scene, even though he had been shot, Davie tried to run him over with a VCA truck. Before he fled the scene, Davie robbed two of his victims.

Davie's history, character, and background provide very little in mitigation. Davie grew up in a relatively stable, supportive home environment as the youngest of four children. Davie did have difficulties living up to the example set by his older siblings, but he was neither ignored nor abused in any way as he grew up. Davie's parents did experience some marital difficulties around the time Davie became a teenager, and it was at this time that Davie began getting into trouble at school. Davie's problems at school involved behavior difficulties, possession of marijuana, and fighting, which resulted in numerous suspensions. At age fifteen and sixteen, Davie "seemed to fall into a rather deviant peer group." He had also been charged with two or three juvenile offenses that involved receiving stolen property or theft. He was expelled from school the second time he was caught with marijuana, and then attempted suicide by overdosing on his father's pain medication.

On the other hand, Davie's father, William Davie, testified that as the youngest child, Davie did not get the attention his other three siblings received. He further testified that Davie was good in sports and had a very close relationship with his daughter Paris. The father stated that Davie was more like a mother than a father to Paris, because they were very close, and he would have her with him whenever he had time.

Two psychologists, Dr. John Kenny and Dr. James L. Brown, also testified on Davie's behalf. Dr. Kenny opined that Davie suffered from postconcussion syndrome that arose from a head injury he sustained when he was struck on the back of the head with a baseball bat at age eighteen. Davie and girlfriend Sonya Barnes had reported to Dr. Kenny that since the injury, Davie was prone to forgetfulness, irritability, mood swings, and "blowing up." However, Dr. Kenny testified that Davie's performance on tests measuring cognitive functioning was in the normal range, but that he had a difficult time organizing information that came to him rapidly. Dr. Kenny stated that Davie seemed to know right from wrong and displayed no evidence of mental illness or psychosis. Dr. Brown diagnosed Davie as suffering from a conduct disorder, and concurred in Dr. Kenny's diagnosis of Davie's postconcussion syndrome. Dr. Brown stated that Davie has a strong personality trait of impulsiveness and low frustration tolerance, which means he cannot stay on one job or task very well. Dr. Brown placed Davie's I.Q. at eighty-two, a drop of four points from when he was tested at age fourteen.

With regard to the mitigating factors in R.C. 2929.04(B), Davie's postconcussion syndrome and conduct disorder do not rise to the level of a mental disease or defect under factor R.C. 2929.04(B)(3). See State v. Brooks

(1986), 25 Ohio St.3d 144, 155–156, 25 OBR 190, 200, 495 N.E.2d 407, 417.

Factor (4) is entitled to weight, since Davie was nineteen years old at the time of the offenses.

Factor (5) also deserves some weight in mitigation, since Davie lacked a significant criminal history. While Davie was expelled from school when he was found with marijuana for a second time, there is no evidence that he was criminally charged as a juvenile for this offense.

Nevertheless, upon independent weighing, we find that the statutory aggravating circumstances in this case, the purposeful killing of two persons while committing aggravated robbery, aggravated burglary, and kidnapping, outweigh the mitigating factors beyond a reasonable doubt. There is absolutely nothing mitigating in the nature and circumstances of the offense—the evidence and circumstances portray a horrific course of criminal conduct by Davie at his former job against three innocent people, two of whom had considered Davie to be their friend. Everett's testimony indicates that Coleman fell prey to Davie's murderous intent merely because Coleman worked for VCA. The utter brutality Davie inflicted on Tracey Jefferys was staggering. Davie's pursuit of Everett seemed to indicate that he wanted no one alive to bear witness to his criminal rampage. The remaining statutory mitigating factors offer little weight. The aggravating circumstances in the murders of Coleman and Jefferys plainly outweigh the mitigating factors in this case. Davie's actions in these crimes merit the capital penalty to which he was sentenced.

80 Ohio St.3d at 332–35, 686 N.E.2d 245.

Petitioner is not entitled to relief on any aspect of his thirty-third claim, or on the basis that the putative errors cumulatively deprived him of his right to a fundamentally fair trial.

## A. Insufficient Investigation

 Petitioner contends that additional pre-penalty phase investigation would have uncovered additional witnesses whose testimony would have placed the petitioner in a light more favorable than that developed at his trial. To support his contention, petitioner submits affidavits from seven individuals. Those affidavits state that the petitioner: loved his daughter, was a hard worker, first encountered serious problems in high school with incidents leading to suspension and expulsion, was respectful and attentive to his elders, did not start fights, and did not get as much attention from others as his siblings.

Much of this information was already presented by witnesses who testified in his behalf: a former principal at the grammar and high school attended by the petitioner, his aunt, his father, and two experts. Although their testimony did not include all the details or examples that the other witnesses might have added, their testimony covered the same general topics. Through them, the jury learned about the course of petitioner's education, including his: increasing disciplinary problems; having fallen into bad company in high school; parents' concerns and efforts to rear him to be as successful as his siblings and their disappointment and frustration with the course he was taking; willingness to work hard; injury with a baseball bat and apparent consequences; and love for and attention to his daughter.

There is no basis, in my view for concluding that the pre-penalty phase investigation was inadequate. Though petitioner points to additional witnesses, he fails to show that the failure to call them deprived him of an opportunity to present himself

and his background favorably to the jury. He has not pointed to any significant gaps in the record regarding his character and qualities. He was, accordingly, not prejudiced by the failure to call additional witnesses.

### B. Failure to Obtain Necessary and Competent Experts

■ Petitioner has submitted an affidavit from Janice D. Ort, Ph.D. This affidavit and the information it contains were not presented with the petitioner's untimely state court *Murnahan* petition. They cannot, accordingly, be considered in this proceeding, even if that petition had been timely.

In any event, the petitioner is not entitled to relief on this claim, which, in essence, seeks to challenge the competence of the experts whom the petitioner's attorneys called by showing that another expert finds their methods, work, and results inadequate, and below commonly accepted professional standards.

■ A defendant is entitled to effective assistance of counsel, not effective assistance of experts. Thus, as the Second Circuit pointed out in *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir.1998), in which a habeas petitioner submitted a report stating that his original expert had not conducted an adequate examination,

> The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate. *See Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir.1990); *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir.1990). Furthermore, it would undermine the finality of state criminal convictions, which would constantly be subject to psychiatric reap-

praisal years after the trial had ended. *Harris*, 949 F.2d at 1517–18; *Silagy*, 905 F.2d at 1013.

There is no merit to petitioner's procedurally defaulted contention that his counsel failed to provide constitutionally adequate assistance because the experts they called to testify failed themselves to provide adequate expert assistance. *See also Walton v. Angelone*, 321 F.3d 442, 466 (4th Cir.2003) (citation omitted) (an attorney is not "required to shop for a more favorable expert.").

### C. Inadequate Voir Dire

■ The petitioner claims that trial counsel performed inadequately during voir dire by: 1) telling prospective jurors that a death verdict was only a recommendation; 2) petitioner would receive a life sentence of either twenty or thirty years if sentence to life, rather than death; 3) failing to discuss sentencing phase issues with the prospective jurors; 4) not asking about mitigating factors that counsel anticipated raising at the penalty phase; and 5) failing to determine if any jurors would automatically return a death verdict on the basis of guilt as to capital murder.

As previously noted, the Sixth Circuit has stated that "Counsel's actions during voir dire are presumed to be matters of trial strategy. 'A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'" *Miller v. Francis*, 269 F.3d 609, 615–16 (6th Cir.2001) (citations omitted); *see also Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir.2001) (no prejudice shown from failure to "life-qualify" defendant's capital trial jury).

Petitioner has not called this court's attention to any cases in which the deficiencies which he lays at his trial counsel's

door have been found to violate fundamental fairness. He is not entitled to relief on this claim.

### D. Failure to Present Available Mitigation Evidence

Petitioner faults the performance of his trial counsel at the penalty phase for: not making an opening statement at the outset of the penalty phase; not having a theory for the presentation of their evidence; relying on inadequate experts; and not developing additional evidence (namely, as found in Dr. Ort's report prepared for these proceedings).

■ With regard to alleged ineffective assistance of counsel where a lawyer has elected not to present an opening statement, the Sixth Circuit has stated:

A trial counsel's failure to make an opening statement, ..., does not automatically establish the ineffective assistance of counsel. *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir.1993) (holding that defense counsel's decision not to present an opening statement because he did not know what Haddock would say on the witness stand was not constitutionally deficient performance); *United States v. Rodriguez–Ramirez*, 777 F.2d 454, 458 (9th Cir.1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel."); *United States v. Salovitz*, 701 F.2d 17, 20–21 (2d Cir.1983) (noting that trial counsel's decision to waive an opening statement is often a matter of trial strategy "and ordinarily will not form the basis for a claim of ineffective assistance of counsel").

*Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir.2002).

There is no merit to petitioner's contention that his attorneys did not have a theory for their presentation of evidence in mitigation—which is, essentially, a challenge to the attorneys' selection of witnesses and sequence of their presentation. For reasons previously stated, counsel's choice of witnesses was not constitutionally deficient. The order in which to call witnesses is a fundamental aspect of trial strategy, and will not be second-guessed on habeas review.

Petitioner has not cited any cases supporting his contention that the defects his current attorneys see in the theory of his case during the penalty phase violated his right to a fundamentally fair trial. He is not entitled to prevail on this claim. *See Johnson v. Lockhart*, 921 F.2d 796, 798 (8th Cir.1990) (record belied claim that counsel failed to project a theory of the case).

Petitioner's remaining contentions with regard to the alleged deficiencies of his attorneys' performance during the penalty phase—use of inadequate experts and failure to uncover and present additional evidence (namely, as found in Dr. Ort's report prepared for these proceedings)—have been addressed adequately in the preceding section.

### E. Failure to Object to Improper Jury Instructions

Petitioner claims that his counsel acted incompetently when they failed to object to the jury instructions at the penalty phase. As discussed *infra*, the jury instructions were not improper or impermissible. There being no grounds to object, the failure to do so did not constitute ineffective assistance of counsel.

### XII. Prosecutorial Misconduct During the Penalty Phase—Claim 34

■ Petitioner claims that unconstitutionally improper conduct on the part of

the prosecutor during the penalty phase tainted his death sentence.

Petitioner complains about several aspects of the prosecutor's closing argument, including: calling on the jury as the conscience of the community; suggesting chaos will result if the laws are not followed; asserting that the petitioner was eligible for the death penalty eight times over; stating that "Sometimes you get what you deserve; using photos of the victims during the argument; expressing his personal opinions, and denigrating the petitioner's humanity"; and 7) misstating the law by implying that certain factors were aggravating circumstances, when they were not.

The Ohio Supreme Court responded to the petitioner's complaints about the prosecutor's statements in closing argument by stating:

Davie first mentions comments in which he claims that the prosecutor aligned himself with "truth and justice." However, Davie failed to object and therefore waived all but plain error. [State v.] Slagle, supra, [(1992)] 65 Ohio St.3d [597] at 604, 605 N.E.2d [916] at 925. The comments about truth and the justice system were largely innocuous. While the penalty phase comments may have been a bit embellished, they were not outcome-determinative or unduly prejudicial.

With respect to the second group of comments, Davie claims that the prosecutor focused repeatedly on the horror of the crime rather than the evidence. Davie asserts that the prosecutor inflamed the jury by using gruesome photographs to direct attention to the brutality of the crimes. Once again, Davie failed to object to comments he complains of now. While a conviction based solely on inflamed passions, rather than proof of guilt, requires reversal, State v.

Williams (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911, it is clear that even absent these remarks, the jury would have found Davie guilty. See [State v.] Beuke, supra [(1988)], 38 Ohio St.3d [29] at 33, 526 N.E.2d [274] at 280. Moreover, the prosecutor's comments were fair and based on properly admitted evidence. See State v. Gumm (1995), 73 Ohio St.3d 413, 420, 653 N.E.2d 253, 262.

In the third group, Davie contends that the prosecutor denigrated both defendant and defense counsel. However, Davie objected to only one comment cited: "The defense has been classical. It's the wait and see defense. * * * The Defense has waited and has seen from the evidence what the State had * * *." The trial court sustained the objection as to the phrase "classical defense." The other comments pointed out by Davie do not amount to plain error: (1) "This isn't an intellectual game of being cute." (2) " * * * [A]nd this is before the supposedly blood loss defense. It's malarkey." (3) "[I]t's another part of the smoke screen justice in this case." (4) "If you can believe that, honestly, I think that maybe, just maybe, Roseanne can sing the National anthem. It's absolutely ridiculous." (5) "[H]e has no empathy * * *. [H]e doesn't have any feelings or a conscience." (6) "[W]e first had the mistaken identity plot, and then we get into now, the post-concussion syndrome, come on." (7) "He's a sociopath. He doesn't feel. He doesn't have a conscience."

While some remarks arguably exceeded the bounds of propriety, they were not outcome-determinative, either individually or collectively. [State v.] Long, supra [(1978)], 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. None of these re-

marks rises to the level of misconduct or prejudice that we found in *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 206–207. The comments alleged to be the prosecutor's expression of his personal beliefs were permissible, since they were based on the evidence presented during the penalty phase. *See State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674, 684.

In the last group, Davie alleges that the prosecutor argued improper law to the jury: (1) "In short, this Defendant is eligible for the death penalty eight times over." (2) "[A] specification of mass murder and multiple murder." (3) "But what does he do? And this takes a considerable period of time. This course of conduct to take human life, and also after repeatedly beating this poor woman to death. Then attempts two other times to kill John Everett. That is aggravating circumstances." (4) "He kidnapped these people, and by gunpoint, terrorized them. That is aggravating circumstances." The defense objected to the second and third comments, but did not object to the first and fourth.

The third statement is erroneous under *State v. Landrum* (1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710, 719. The manner of killing is not a statutory aggravating circumstance. However, the court's instructions to the jury, correctly specifying the statutory aggravating circumstances to be considered, ameliorated any prejudice to Davie.

The implication in the second statement above, that there is a "mass murder" specification in addition to a multiple murder specification, was also remedied by the court's jury instructions. Any prejudicial impact is minimized by our independent review. *[State v.] Lundgren, supra* [(1995)], 73 Ohio St.3d 474, 653 N.E.2d 304.

The statements not objected to do not amount to plain error. The "eight times over" comment was embellished, but theoretically accurate. The last comment was accurate in the total given context: kidnapping is an aggravating circumstance. Since none of these remarks prejudicially affected substantial rights of the accused, *State v. Smith* (1984), 14 Ohio St.3d 13, 14–15, 14 OBR 317, 318–319, 470 N.E.2d 883, 885–886, proposition IV is not well taken

80 Ohio St.3d at 329–30, 686 N.E.2d 245.

The petitioner has not shown that these rulings either (1) were "contrary to … clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States."

A further basis for finding this claim without merit is the Sixth Circuit's statement in *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir.2000):

when addressing claims of prosecutorial misconduct, we first determine whether the challenged statements were indeed improper. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999). Upon a finding of such impropriety, we then "look to see if they were flagrant and warrant reversal." *Id.* (citing *[United States v.] Carroll*, 26 F.3d 1380, 1388 [(6th Cir.1994)]. Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549–50.

The ultimate "relevant question," the Supreme Court held in *Darden v. Wainwright*, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), "is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Even if all the statements were improper, they did not so infect the trial.

Claim thirty-four is without merit.

## XIII. Mitigation Phase Jury Instructions— Claims 35—46

Petitioner claims that in a dozen instances the trial judge erred in instructing the jury at the penalty phase of his trial. There is no merit to these claims.

### A. Reasonable Doubt—Claim 35

Petitioner repeats the contention, made in his nineteenth claim with regard to the guilt phase, that the court's definition of reasonable doubt was improper. In addition, the petitioner contends that the only proper instruction on the standard of proof at this stage is that proof should be beyond all doubt. He cites no cases to support this contention. The Ohio Supreme Court summarily rejected this claim. 80 Ohio St.3d at 324, 686 N.E.2d 245.

The petitioner has not shown that this rulings either (1) was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." This definition has been held in the context of a capital habeas proceeding not to violate due process. *Coleman v. Mitchell*, 268 F.3d 417, 436 (6th Cir.2001).

There is no merit to petitioner's thirty-fifth claim.

### B. Life Verdict Must be Unanimous— Claim 36

██ The petitioner claims that the trial court erred when, in conjunction with its "acquittal first" charge, it instructed the jury that a sentence of life imprisonment must be unanimous. This claim was first raised in post-conviction proceedings, and thus is procedurally barred.

Absent that bar, in light of the Sixth Circuit's decisions in *Davis v. Mitchell*, 318 F.3d 682, 690 (6th Cir.2003), and *Mapes v. Coyle*, 171 F.3d 408, 416 (6th Cir.1999), the petitioner's challenge would have substantial appeal. Thus, in *Davis* the court stated, "the silence in these instructions on the lack of unanimity required for mitigating circumstances, the improper 'acquittal-first' instruction, and the unqualified instruction, 'Now, as you know . . . the law requires that in order for you to reach a decision all 12 of you must be in agreement'—would have led a reasonable jury to apply an unconstitutional standard of unanimity at all stages in the deliberative process." 318 F.3d at 690.

However, as the court concluded in *Mapes:*

> the trial court's instructional errors do not require granting Mapes's habeas petition because neither of these last two instructional issues was raised on appeal. Thus, Mapes's procedural default is an adequate and independent ground for affirming his sentence. Only in the context of deciding whether Mapes's appellate counsel was unconstitutionally ineffective in failing, nevertheless, to raise these matters on direct appeal are these underlying errors relevant.

171 F.3d at 416.

In light of the effect of the procedural default, the petitioner is not entitled to relief on his thirty-sixth claim.

## C. Acquittal First Instruction— Claim 37

The trial judge gave an "acquittal first" instruction: *i.e.,* he told the jury that before it could consider whether to impose a life sentence, it first had unanimously find that a death sentence was not warranted. Though this claim was defaulted, the state appellate court considered its merits, holding that no error had occurred (Amended Appendix. Vol. III, at 94).

In *State v. Brooks,* 75 Ohio St.3d 148, 160, 661 N.E.2d 1030 (1996), the Ohio Supreme Court had, however, held that an acquittal-first instruction violates the Eighth and Fourteenth Amendments. The court's opinion in that case expressly indicated that its ruling was to have prospective effect only: "In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed." *Id.* at 162, 661 N.E.2d 1030.

As with petitioner's thirty-sixth claim, relating to unanimity, the ruling in *Mapes* that relief is barred as a result of procedural default, 171 F.3d at 416, the same bar precludes relief on this claim. The petitioner is not entitled to relief on his thirty-seventh claim.

## D. Death Verdict a Recommendation— Claim 38

■ The trial judge informed the jury that its verdict as to a death sentence was a recommendation, and that the court would make the final decision. The judge also made clear that a sentence of life imprisonment was binding and final. This instruction was contrary to the recommendation of the Ohio Jury Instruction Committee Comments to OJI Pattern Instruction, 40 OJI 503.011.

The Ohio Supreme Court stated that "the term 'recommendation,' however, does not diminish the jury's sense of responsibility, accurately reflects Ohio law, and does not constitute error." 80 Ohio St.3d at 326–27, 686 N.E.2d 245. This view is shared by the Sixth Circuit. *Mapes, supra,* 171 F.3d at 415 ("even if the trial judge's instruction was erroneous it could not have diminished the jury's sense of responsibility"). The petitioner has not shown that the state-court decision either 1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

There is no merit to petitioner's thirty-eighth claim.

## E. Charge re. Weighing Process—Claim 39

■ The trial judge told the jury that "outweigh means to weigh more than, to be more important than." Petitioner contends that this instruction failed to give guidance to the jury on how to compare the facts supporting aggravating circumstances with facts supporting mitigating factors.

This claim was defaulted. Nonetheless, the opinion of the Ohio Court of Appeals in petitioner's *Murnahan* proceeding addressed its merits, noting that the Ohio Supreme Court had approved this instruction in *State v. Spirko,* 59 Ohio St.3d 1, 34, 570 N.E.2d 229 (1991).

The petitioner has not shown that the state-court decision either 1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "involved an unreasonable application of ... clearly estab-

lished Federal law, as determined by the Supreme Court of the United States."

There is no merit to petitioner's thirty-ninth claim.

### F. Failure to Instruct re. Presumption of Life—Claim 40

Petitioner claims that the trial court improperly failed to instruct the jury that he had a presumption of life and the right to live, and that the mere presence of aggravating circumstances, even in the absence of mitigating circumstances did not mandate a death sentence. This claim was defaulted.

Other courts have rejected the petitioner's contention. *See Smallwood v. Gibson,* 191 F.3d 1257, 1271 (10th Cir.1999) ("petitioner has failed to cite any judicial authority, and our independent research revealed none, that the Constitution mandates a 'presumption of life' instruction.").

Petitioner cites *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) as support for this claim. In *Taylor* the Court held that in a non-capital criminal trial where the proof was nothing more than a swearing contest between the victim and the defendant, the refusal of the trial court to give a presumption-of-innocence instruction during the guilt phase of trial denied the defendant due process, given the genuine risk that the jury convicted the defendant on the basis of extraneous considerations. 436 U.S. at 483–90, 98 S.Ct. 1930.

Petitioner's conflation of the right to a charge on the presumption of innocence with his presumption of life charge, and reliance on *Taylor* in making this claim are misplaced: "[a]s one can see, the facts and holding of *Taylor* simply do not support the proposition that a defendant in a capital trial is entitled to a presumption-of-life-imprisonment instruction during the penalty phase of the trial." *Slaughter v. Parker,* 187 F.Supp.2d 755, 815 (W.D.Ky. 2001).

Petitioner's fortieth claim is without merit.

### G. Non–Statutory Aggravating Circumstances—Claim 41

The petitioner contends that the trial court impermissibly instructed the jury that:

> The nature and circumstances of the aggravated murder are relevant only insofar as they may relate to any mitigating factors alleged by the defendant, or any of the aggravating circumstances

. . . .

Under Ohio law, petitioner asserts, the aggravating circumstances against which mitigation evidence is weighed are limited to the specifications of aggravating circumstances set forth in O.R.C. §§ 2929.044(A)(1)—(8), to the extent alleged in the indictment. The jury should have been told, petitioner contends, that it could consider the nature and circumstances of the murders only if they have any mitigating value, and that it could not consider the nature and circumstances of the crime as aggravating circumstances.

The Ohio Supreme Court held that consideration of this claim was barred by the default of not having objected to this instruction. In addition, the Court stated:

> Davie cites the following portion of the jury instructions in the penalty phase as raising a nonstatutory aggravating circumstance: "The nature and circumstances of the aggravated murder are relevant only insofar as they may relate to any mitigating factors alleged by the Defendant, or any of the aggravating circumstances pertaining to the first count regarding the death of John Ira Coleman for which the Defendant was found guilty." The trial court gave the

same instruction concerning the death of Tracey Jefferys in count two.

Here, the court instructed the jury prior to the above passage that the aggravating circumstances "are precisely as set out in the specifications contained in the verdict forms on these specifications." The court then set out each of the four aggravating circumstances and stated that "[a] homicide itself is not to be considered aggravated circumstance-an aggravating circumstance."

Since the jury instruction accurately set forth the aggravating circumstances to be considered by the jury in its weighing process, any error was non-prejudicial. Moreover, the facts and circumstances are relevant to the aggravating circumstances. *See State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352–356, 662 N.E.2d 311, 319–322.

80 Ohio St.3d at 327–28, 686 N.E.2d 245.

The petitioner has not shown that the state-court decision either 1) was "contrary to … clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States."

There is no merit to petitioner's forty-first claim.

## H. Determination of Relevancy of Evidence re. Sentencing— Claim 42

█ The trial court instructed the jury that:

In reaching your verdict, you were instructed that you will consider all of the evidence, including Exhibits presented in the first phase of the trial, which you deem to be relevant to the proven aggravating circumstances, as if fully presented in this proceeding, along with all of the additional evidence relative to the mitigating factors offered by Defendant.

Petitioner contends that inclusion of the phrase, "which you deem relevant," to have been improper because it displaced the court's rulings on admissibility with the juror's lay understanding of relevance.

This claim was defaulted, because it was not raised until the petitioner's *Murnahan* proceeding. Notwithstanding the default, the state appellate court noted that the instruction was erroneous in view of *State v. Getsy*, 84 Ohio St.3d 180, 702 N.E.2d 866 (1998). Though the *Getsy* decision was issued after the judgment in the petitioner's case had become final on November 26, 1997, the state appellate court viewed this claim in the context of possible ineffective assistance of counsel.

Viewed thus, the court held that there was no merit to the claim because the petitioner could not show prejudice.

The petitioner has not shown that the state-court decision either 1) was "contrary to … clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "involved an unreasonable application . of…clearly established Federal law, as determined by the Supreme Court of the United States."

Likewise in this case, the petitioner has not shown prejudice: though he asserts he was prejudiced in a conclusory fashion, he has not attempted to show how this was so.

The petitioner's forty-second claim is without merit.

## I. Unanimity re. Mitigating Factors—Claim 43

█ The petitioner complains that the trial court failed to instruct the jury on the degree of proof needed to establish a mitigating factor, or that jurors need not be unanimous before such factor could be considered in mitigation. Consequently, ac-

cording to the petitioner, the jurors were simply left with the general reasonable doubt and unanimity instructions.

This claim was first asserted in the *Murnahan* proceedings. Though the appellate court held that the claim was barred due to the untimeliness of the petitioner, it considered the merits, and concluded, without analysis, that the instruction had been proper.

■ A jury need not be unanimous with regard to a mitigating factor for jurors to consider it as mitigation. *McKoy v. North Carolina,* 494 U.S. 433, 435, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (any requirement that "prevents the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously" is unconstitutional); *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

At the petitioner's penalty phase, the court instructed the jurors that:

> All 12 jurors must agree on a verdict. If all 12 jurors find by proof beyond a reasonable doubt that the aggravating circumstances which the Defendant, Roderick Davie was found guilty of committing in the death of John Ira Coleman, outweigh the mitigating factors, then you must return such a finding to the Court, and as a matter of law, you would have no choice but to make a recommendation that the sentence of death be ordered.

(Doc. 47 [Penalty Phase Transcript], at 298).

In *Davis v. Mitchell,* 318 F.3d 682, 684–85 (6th Cir.2003), substantially the same charge was given: "If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances which Wiley Davis, Jr. was found guilty of committing outweigh the mitigat-

ing factors, if any, then you must return such finding to the Court."

No default barred consideration of the merits of the petitioner's challenge to the lawfulness of the unanimity charge in *Davis.* In light of *McKoy* and *Mills,* the court concluded in *Davis* that the unanimity instruction was error of a constitutional dimension, and relief was granted:

> Our inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Jones v. United States,* 527 U.S. 373, 390, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *see also Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

> Ohio's death penalty statute requires that in order for a jury to recommend a sentence of death, it must unanimously find that the aggravating circumstances outweigh any mitigating circumstances present in the case. In the absence of a unanimous finding that death is appropriate, the jury must recommend imprisonment for a unanimously agreed-upon specified term.[n. 3] Although the Supreme Court has indicated that the weighing of aggravating and mitigating circumstances in death penalty cases is not itself constitutionally required, once a state has adopted that method of narrowing the class of persons eligible for the death penalty and providing for individualized juror consideration of the appropriateness of the death penalty in a particular case, the Eighth Amendment requires that jurors not be precluded from giving effect to the mitigating evidence by an instruction requiring unanimity as to the presence of mitigating circumstances. *See Mills, supra.* Any instruction requiring that a jury must first unanimously reject the death penalty before it can consider a life sentence

likewise precludes the individual juror from giving effect to mitigating evidence and runs afoul of *Mills*.

[n. 3] Section 2929.03(D)(2) of the Ohio Revised Code provides in relevant part: Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to [life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment].

The Ohio Supreme Court has recognized that under Ohio's death penalty statute, a sole juror can prevent the death penalty if he or she individually finds that mitigating circumstances are present in the case and does not agree that the aggravating circumstances outweigh the mitigating circumstances. *See Ohio v. Brooks*, 75 Ohio St.3d 148, 661 N.E.2d 1030, 1042 (1996). The resulting non-unanimous jury (as to the death penalty) must nevertheless return a unanimous verdict as to which of the sentences of imprisonment should be imposed.

Given the requirement of unanimity as to the jury's ultimate recommendation of either death or life under Ohio law, it is not surprising that the unarticulated but constitutionally required non-unanimous mechanism that will prevent a recommendation of death is obscured to such an extent that it cannot even be said to be implied by the instructions in this case. Instead of instructing the jury that it need not be unanimous in rejecting the death penalty, the trial judge in this case told the jury that in order to return a verdict for life imprisonment, "you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors." Immediately thereafter, the Court instructed that "since this is a criminal case the law requires that in order for you to reach a decision all 12 of you must be in agreement." The verdict form likewise reflected a unanimity requirement in finding that the aggravating circumstances do not outweigh the mitigating circumstances, setting out twelve signature lines under the statement, "We, the jury ... do find that the Aggravating Circumstances which the defendant, Wiley Davis, Jr., was found guilty of committing are not sufficient to outweigh the Mitigating factors present in this case beyond a reasonable doubt." This instruction, combined with the jury verdict form, not only "could" but by its plain language "would" lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs

the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty. Further adding to the confusion, the jury was never told, either expressly or impliedly, that individual jurors may consider mitigating circumstances in the weighing process regardless of the lack of agreement with other jurors as to the presence of that factor. In sum, the silence in these instructions on the lack of unanimity required for mitigating circumstances, the improper "acquittal-first" instruction, and the unqualified instruction, "Now, as you know ... the law requires that in order for you to reach a decision all 12 of you must be in agreement"—would have led a reasonable jury to apply an unconstitutional standard of unanimity at all stages in the deliberative process.

The error in the present case is approximately the same as the error described by Judge Becker in *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997). In that case, the Court of Appeals for the Third Circuit vacated a death sentence as violating *Mills* where "the relevant portion of the jury charge emphasiz[ed] the importance of a unanimous finding, using the phrase frequently and in close proximity—within seven words of—the mitigating circumstances clause," without explaining that unanimity is not required in consideration of mitigating evidence. *Id.* at 923. Here, as there, the trial court's instructions are silent as to the different unanimity requirements for aggravating and mitigating circumstances, making no mention of the individual juror's power to prevent the death penalty by giving effect to mitigating circumstances absent the agreement of the other jurors regarding the presence of those mitigating circumstances. Nor do they make clear that the jury need not be unanimous in rejecting death in order to render a verdict for life imprisonment. The inescapable likelihood in this case that the jury understood the instructions to require unanimity in both its ultimate and interim conclusions violates Mills.

Our dissenting colleague has failed to describe the record correctly with respect to the Ohio trial court's unanimity instruction regarding mitigating factors. In his dissenting opinion immediately following this opinion, he says that the Ohio trial court's unanimity instruction—"since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement"—is "seventy lines and a recess away" from the instruction on "weighing mitigating factors" and is unrelated to mitigating factors. This is simply wrong, as the record itself demonstrates.

As to aggravating and mitigating factors, the trial judge instructed the jury that they must consider and sign one of two verdict forms. The first form he read to them was the verdict form for imposing the death penalty. He then said immediately: And there are twelve signature bars, where you would sign that [verdict form], if that was your verdict.

The second verdict [form] as to Count One [acquittal of the death penalty] says:

"We, the Jury in this case, being duly impaneled and sworn, do find that the Aggravating Circumstances which the defendant, Wiley Davis, Jr., was found guilty of committing are not sufficient to outweigh the Mitigating Factors present in this case beyond a reasonable doubt" and "We, the Jury, recommend that the defendant, Wiley Davis, Jr. be sentenced to life imprisonment with parole eligibili-

ty after serving"—and then down here there is an asterisk that says, "Insert in ink either twenty (20) or thirty (30) full years of imprisonment" and, again, twelve signature bars [for each of you to sign]. (Emphasis added.) Immediately following this instruction regarding their finding that the aggravating circumstances "are not sufficient to outweigh the mitigating factors" the court says: Now, as you know, since this is a criminal case the law requires that in order for you to reach a decision all twelve of you must be in agreement.

It is hard to conceive how this instruction concerning unanimity and the need for each juror to sign one of the twelve bars could be anymore plain that the jury must be unanimous if it finds that one or more mitigating factors outweighs the aggravating circumstances. This instruction—in the words of *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)— is clearly "opposite to that reached by [the Supreme] Court on a question of law" in the *Mills* and *McKoy* cases discussed above. Our dissenting colleague is simply unable to get around the clarity of the erroneous instructions that the jury must be unanimous as to mitigators and that each juror must so attest by signing a form demonstrating unanimity. The "acquittal first" instruction and absence of any other instruction which conflicts with the requirement of unanimity on mitigators would simply reinforce in the mind of each juror that unanimity was required for both aggravators and mitigators.

318 F.3d 682, 687–91.

As in *Davis*, the trial court's discussion of the verdict form, with the court calling attention to the twelve signature blanks, immediately followed its review of the choices of verdicts which the jury could reach. (Doc. 47 [Penalty Phase Transcript] at 303).

In contrast to the decision in *Davis*, another panel of the Sixth Circuit reached the opposite conclusion in *Roe v. Baker*, 316 F.3d 557, 564 (6th Cir.2002). In that case, the court stated:

> The issue on collateral review in the federal courts is whether a defendant's federal constitutional rights were violated by the instruction. We addressed this same issue in *Coe v. Bell*, 161 F.3d 320, 339–40 (6th Cir.1998), and held that such a unanimity instruction as to a sentencing recommendation of death did not violate the Constitution. Again in *Scott v. Mitchell*, 209 F.3d 854, 876 (6th Cir.2000), we observed the same. Just as in *Coe* and *Scott*, the instructions at issue do not require unanimity as to a specific mitigating factor, which would violate *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), but only as to the overall weighing process, which is permissible. Further, as we observed in *Scott*, both this Circuit and the Supreme Court "[have] chastised such instructions as encouraging deadlock and undermining the strong governmental interest in unanimous verdicts." *Scott*, 209 F.3d at 877 (*citing Jones v. United States*, 527 U.S. 373, 381–84, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) and *Coe*, 161 F.3d at 339–40). Accordingly, this assignment is without merit.

The dissent in *Davis* pointed out the apparent inconsistency between the holdings in *Roe* and *Coe* and the majority opinion in *Davis* on the issue of the charge regarding unanimity. The majority in *Davis* did not, however, discuss *Roe* or *Coe* in the course of reaching its conclusion that unanimity charge contravened *McKoy* and *Mills*.

In view of the ruling in *Mapes* that default forecloses relief, the existence of procedural default in this case relieves this court of the difficult problem of trying to resolve the inconsistencies between *Roe* and *Coe,* on the one hand, and *Davis,* on the other.

In light of the procedural default, petitioner is not entitled to relief on his forty-third claim.

### J. Instruction re. O.R.C. § 2929.04(B)(7) Mitigating Factor—Claim 44

The trial court instructed the jury that it could consider:

Any other factors that are relevant to the issue of whether the Defendant should be sentenced to death. Keep in mind that all of these specific factors may not be presented in this case, nor need they all be present before you can find that aggravating circumstances are not sufficient to outweigh the factors in mitigation of the sentence of death.

(Doc. 47 [Penalty Phase Transcript], at 296–97.)

The petitioner contends that use of the term "relevant to the issue of whether the offender should be sentenced to death" provided the jury with no guidance as to which it properly could consider pursuant to this instruction.

This claim was defaulted. Nonetheless the appellate court held in its opinion on petitioner's *Murnahan* petition that it properly restated the statutory provision found in O.R.C. § 2929.04(B)(7).

Petitioner, who notes that this is a standard instruction, cites no cases in support of this claim, and thus has not shown that error occurred. He has, as well, not shown that the appellate court's ruling either 1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or

2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

Petitioner is not entitled to relief on his forty-fourth claim.

### K. Instruction Not to Consider Sympathy—Claim 45

 Petitioner complains about the trial court's instruction to the sentencing phase jury that "you must not be influenced by any consideration of bias, sympathy, or prejudice.... [M]ake your findings with intelligence, impartiality, without bias, sympathy, or prejudice,...." (Doc. 47 [Penalty Phase Transcript], at 303–04).

This claim was defaulted. It was not considered on its merits by any Ohio court. Petitioner cites no case holding that a trial court cannot give this instruction, or otherwise preclude a jury from ruling on the basis of sympathy.

The petitioner is not entitled to relief on his forty-fifth claim.

### L. Allowing Jury to Consider Four Aggravating Circumstances as to Each Murder Count—Claim 46

Petitioner does not discuss this claim in the context of the other instructions during the penalty phase; instead, he refers to his Sixth Claim—that the jury impermissibly was permitted to consider multiple specifications with regard to the aggravated murder charges.

Because there was no error in the framing of the charges in the indictment, as discussed *supra* with reference to petitioner's sixth claim, no error occurred when the charges went to the jury.

Petitioner is not entitled to relief on his forty-sixth claim.

### XIV. Miscellaneous Claims— Claims 47—54

#### A. Sentence Invalidity re. Multiple Sentences—Claim 47

Petitioner claims that the trial judge's acceptance of the jury's death sentence recommendation and sentencing memorandum relied on non-statutory aggravating circumstances and failed to consider significant mitigating evidence. The Ohio Supreme Court rejected this contention on direct appeal:

> Davie contends in proposition XXI that the trial court failed to comply with R.C. 2929.03 in its sentencing opinion. In addition, Davie argues that the trial court improperly considered nonstatutory aggravating factors in its opinion imposing the death sentence.
>
> A review of the sentencing opinion reveals that Davie's assertions are without merit. The trial judge complied with R.C. 2929.03(F) by making specific findings in the four areas enumerated therein. Davie claims that the trial judge erred in referring to the nature and circumstances of the murders and thus transformed them into nonstatutory aggravating circumstances. However, the trial court did not do that. The court simply relied upon and cited the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances are sufficient to outweigh the mitigating factors. *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus, permits this. Moreover, the court is required to review the nature and circumstances in order to determine whether the death penalty is appropriate. *State v. Jester* (1987), 32 Ohio St.3d 147, 153, 512 N.E.2d 962, 969.
>
> Davie's criticisms of the court's explanations of its weighing process are also unpersuasive. Even inadequate explanations of why the aggravating circumstances outweigh the mitigating factors do not necessarily create reversible error. *See State v. Fox* (1994), 69 Ohio St.3d 183, 190–192, 631 N.E.2d 124, 130– 131.
>
> In any event, even assuming that any of Davie's claims raise legitimate points, this court's independent review will readily cure any such errors. *Id.; Lott, supra,* 51 Ohio St.3d at 170, 555 N.E.2d at 304.

80 Ohio St.3d at 328, 686 N.E.2d 245.

The petitioner's challenges to the judge's sentencing memorandum involve interpretations of state law, which are not cognizable in a federal habeas corpus proceeding. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Buell v. Mitchell,* 274 F.3d 337, 350 n. 5 (6th Cir.2001).

The Sixth Circuit has held that relief is not available for noncompliance with O.R.C. § 2929.03(F), the provision on which petitioner bases his claim. *Fox v. Coyle,* 271 F.3d 658, 664 n. 2 (6th Cir.2001) ("the Ohio Supreme Court has held that a defendant is not presumptively prejudiced by a trial court's failure to follow the dictates of Ohio Revised Code § 2929.03(F) as independent review at the state appellate level may cure any error").

#### B. Ineffective Assistance of Appellate Counsel—Claims 50, 51

Petitioner asserts several failings in the representation he received on his direct appeal, including the alleged failure to raise meritorious issues concerning: jury selection, discovery, voir dire procedures, petitioner's absence from the proceedings, trial phase jury instructions, jury misconduct, penalty phase jury instructions, ineffectiveness of trial counsel, and the appellate process.

These contentions presume that the underlying issues would have had merit if presented to the intermediate appellate court. Each of the putatively meritorious issues has been reviewed on its merits earlier in this opinion and none have been found to have merit. Thus, appellate counsel cannot be faulted for not having raised them.

The means by which the venire was drawn comported with Ohio law. Use of voter registration rolls is commonly accepted and has been consistently upheld. Any challenge to the process would have been futile, particularly in view of the lack of objection and demand for a hearing in the trial court.

There was no discovery violation by the prosecution: no *Brady* material exists. There being no grounds to claim that the prosecution violated its disclosure obligations, not asserting such claim on appeal was appropriate.

There was no error in the voir dire process, either due to limitations imposed by the trial judge or misstatements by the prosecutor. An appeal contending that such had existed would have been a waste of time.

There was no denial of the petitioner's right to attend all proceedings. There was, therefore, nothing on which to make such claim on appeal.

The trial-phase jury instructions were appropriate; again, there was no meaningful basis for an appeal.

There is no reason to believe that anything the jurors saw in the Clerk's office as some of the victim's family members were being interviewed could have affected the outcome of the trial. The trial judge's handling of the request to inquire once the circumstances became known was within his discretion. It is highly unlikely that a claim based on that incident would have prevailed.

Many of the claims of improper jury instruction at the penalty phase were reviewed on their merits by either the appellate court or the Ohio Supreme Court.

The reasonable doubt instruction was correct under Ohio law.

Appellate counsel could not have appealed the instruction regarding unanimity for a life sentence or the acquittal first verdict, as no timely objection had been made in the trial court.

In any event, absent a showing—which petitioner has not attempted to make— that reasonably competent counsel should have been aware of the possibility of a challenge at the time the appeal was pending, petitioner's appellate counsel cannot be faulted for failing to raise issues that did not occur to them. Thus, they cannot be charged with ineffective assistance for their failure to have laid the groundwork for the conclusion ultimately reached by the Ohio Supreme Court in *State v. Brooks,* 75 Ohio St.3d 148, 160, 661 N.E.2d 1030 (1996), about the invalidity of the acquittal-first instruction.

Both the statement that a death verdict was a recommendation and the charge about the weighing process have been upheld by Ohio courts as proper in the interim between this decision and petitioner's direct appeal. No fault can be found with the failure of his attorneys to have raised either of these issues, which could not have prevailed.

No court has held that a "life presumption" charge is required—and there is no reason to believe that the Ohio courts would have imposed such a requirement, had petitioner's appellate counsel asked them to do so.

Any claim that the instructions included a nonstatutory aggravating circumstance is

belied by the ruling of the Ohio Supreme Court that there was no error in the aggravating circumstance charge given to the jury at petitioner's trial.

While petitioner's appellate attorneys could have asserted correctly that error occurred when the trial judge told the jury that they could consider all the evidence from the guilt phase of the trial which the jurors deemed to be relevant, that ruling would not have benefitted the petitioner. Though the claim was defaulted, the appellate court considered it on its merits, and concluded that the petitioner would not have been able to show that he was prejudiced.

Petitioner's strongest challenge to the performance of his attorneys on appeal would appear to be their failure to assert a challenge to the putative unanimity instruction re. mitigating circumstances. The Supreme Court's decision in *Mills* predated petitioner's trial, and counsel must be assumed to have been aware of that decision.

There had, however, been a default on the part of trial counsel, who had not challenged this instruction. Challenge on direct appeal was, accordingly, foreclosed, and appellate counsel cannot be faulted for not taking a path that was barred to them.

In any event, even if the default bar had not been an impediment, counsel's performance was not outside the range of competency to be expected under the Constitution. The facts in *Mills* differed significantly from the facts in petitioner's case: there, "the trial judge's instructions stressed the need for unanimity on all issues presented," 486 U.S. at 372, 108 S.Ct. 1860, while in petitioner's case, there was no such overt requirement expressly communicated in the court's instructions. Instead, as the decisions in *Mapes* and *Davis,* on the one hand, and *Coe* and *Roe,* on the other make clear, the fabric of challenge has to be stitched from diverse pieces of the instructions. Counsel's failure to make the connection between *Mills* and the charge in the petitioner's case did not manifest ineffective representation.

The instruction with the phrase, "relevant to the issue of whether the offender should be sentenced to death," could not be appealed due to default in the trial court. In any event the Court of Appeals held that the instruction was a proper recitation of O.R.C. § 2929.04(B)(1). An appeal would have been fruitless.

The putative limitation on the jurors' consideration of any sympathy they might have felt toward the petitioner (or the surviving victim and the families of the decedents) was defaulted. In any event, petitioner has not shown that it had any likelihood of success, much less was at all plausibly meritorious.

There was, finally, no error in allowing the jury to consider multiple specifications with regard to the aggravated murder charges. No grounds to appeal that issue existed.

Thus, petitioner cannot fault the performance of his appellate attorneys with regard to the jury instructions at the penalty phase.

As discussed elsewhere in this opinion, there were no grounds on which appellate counsel could have contended that petitioner's trial counsel provided prejudicially insufficient representation. Thus, failure to make such claim on direct appeal was appropriate.

The proportionality review, as discussed in the following section, did not fail to meet constitutional norms. Thus there were no grounds for raising any defects in that review. Finally, any putative violation of international law is immaterial, and an ar-

gument to the contrary could not prevail on appeal.

Petitioner is not entitled to relief on his fifty-first claim.

### C. Adequacy of Proportionality Review—Claim 52

Petitioner contends that the state reviewing courts failed to conduct a meaningful proportionality review.

On direct review, the Ohio Supreme Court rejected the petitioner's contention that the proportionality review process of O.R.C. § 2929.05 does not comport with constitutional requirements. 80 Ohio St.3d at 328, 686 N.E.2d 245 (citing State v. Steffen, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987)).

Petitioner complains that the proportionality review in his case was too narrow, with the appellate court confining itself to other capital cases that had come before it, and the Supreme Court restricting its review to other instances in which there were two or more murder victims.

In State v. Steffen, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987) (syllabus), the Ohio Supreme Court held that "[t]he proportionality review required by [O.R.C. § ] 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed."

In any event, "there is no federal constitutional requirement that a state appellate court conduct comparative proportionality review." Henderson v. Collins, 101 F.Supp.2d 866, 920 (S.D.Ohio 1999), aff'd in part and rev'd in part on other grounds, 262 F.3d 615 (6th Cir.2001) (citing Pulley v. Harris, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); McQueen v. Scroggy, 99 F.3d 1302, 1333 (6th Cir.1996)).

Petitioner is not entitled to relief on his fifty-second claim.

### D. Unconstitutionally Capricious and Arbitrary Imposition of Capital Punishment—Claim 53

In a lengthy disquisition raising several alleged defects in Ohio's capital punishment system, the petitioner alleges that his sentence is unconstitutional because the death penalty is imposed in an arbitrary and capricious manner, and results, inter alia, in unequal punishment that falls most heavily on African–Americans charged with homicide.

These contentions founder on the rock of precedent, which has refuted similar claims in other capital cases challenging Ohio's procedures and practices. See, e.g., Buell v. Mitchell, 274 F.3d 337, 367 (6th Cir.2001);Coleman v. Mitchell, 268 F.3d 417, 441 (6th Cir.2001) (rejecting, inter alia, claims based on over-representation of African–Americans on death row and international law); Byrd v. Collins, 209 F.3d 486, 539 (6th Cir.2000); Jackson v. Anderson, 141 F.Supp.2d 811, 877 (N.D.Ohio 2001); Smith v. Anderson, 104 F.Supp.2d 773, 846 (S.D.Ohio 2000); Dennis v. Mitchell, 68 F.Supp.2d 863, 902 (N.D.Ohio 1999); Ashworth v. Bagley, 2002 WL 485006, *5 (S.D.Ohio); Stumpf v. Anderson, 2001 WL 242585, *3 (S.D.Ohio).

There is no merit to petitioner's fifty-third claim.

### E. Effect of Cumulative Errors

Petitioner contends that the cumulative effect of the errors about which he complains entitle him to relief. In support of this contention, he cites Walker v. Engle, 703 F.2d 959, 963 (6th Cir.1983), in which the Sixth Circuit held that "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively

produce a trial setting that is fundamentally unfair."

Often cited, *see, e.g., Lorraine v. Coyle,* 291 F.3d 416, 446 (6th Cir.2002); *United States v. Hernandez,* 227 F.3d 686, 697 (6th Cir.2000); *United States v. Polk,* 182 F.3d 919, 1999 WL 397922, *10 n. 7 (6th Cir.1999) (Unpublished Disposition); *United States v. Leeds,* 178 F.3d 1297, 1999 WL 220129, *7 (6th Cir.) (Unpublished Disposition); *Anthony v. Jabe,* 82 F.3d 417, 1996 WL 172136, *2 (6th Cir.) (Unpublished Disposition); *McKinnon v. State of Ohio,* 67 F.3d 300, 1995 WL 570918, *11 (6th Cir.) (Unpublished Disposition); *United States v. Pierce,* 62 F.3d 818, 834 (6th Cir.1995), and sometimes followed, *United States v. Parker,* 997 F.2d 219, 221 (6th Cir.1993) (finding cumulative effect of four otherwise possibly harmless errors denied defendant due process); *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988) (cumulative effect of noncompliance with state evidentiary rules violated due process); *Jamison v. Collins,* 100 F.Supp.2d 647, 693 (S.D.Ohio 2000) (*Brady* violation compounded by other errors); *Groseclose v. Bell,* 895 F.Supp. 935, 960 (M.D.Tenn., 1995) (cumulative effect of false testimony, *Brady* violation, and other constitutional errors); *Rickman v. Dutton,* 864 F.Supp. 686, 716 (M.D.Tenn.1994) (cumulative effect of false testimony, no assistance from counsel, and petitioner being drugged during trial), the court's ruling in *Walker* presupposes error.

In petitioner's case, what errors there may have been were few, and, on balance, trivial, and without effect, either alone or in combination, on the outcome of his trial.

The petitioner is not entitled to relief on his fifty-fourth claim.

### Conclusion

In light of the foregoing, it is

ORDERED THAT the petition for a writ of habeas corpus be, and the same hereby is denied.

So ordered.

### ORDER

This is a capital habeas corpus case in which the petition was denied. Pending is petitioner's motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e). For the reasons that follow, the motion shall be denied.

Petitioner claims that one of his claims (Claim 2, relating to the admissibility of statements to the police shortly after the killings giving rise to petitioner's conviction) was not addressed by the undersigned.

Petitioner is wrong: Claim 2 was discussed along with petitioner's related Claim 1 at pp. 595–600 of the opinion. That discussion ended with the statement, "Not having met this burden as to either *Mosley* or *Edwards,* the petitioner is not entitled to relief on his first or second claims." (Doc. 171, at 29). A detailed assessment of the petitioner's claim preceded that conclusion.

The remainder of petitioner's motion to alter or amend judgment simply takes issue with the outcome of my consideration of his claims. That consideration included adjudication of the merits of petitioner's claims, including the many claims that were procedurally defaulted.

To the extent that the petitioner may raise new arguments or issues, or recast arguments and issues that he presented in his petition, I decline to consider those new contentions, which appear, in any event, to be without merit.

The petitioner's motion to alter or amend judgment shall, accordingly, be denied.

 Petitioner's motion, regardless of its caption, is in the nature of a motion for reconsideration. Motions for reconsideration are disfavored, and a motion for reconsideration is unfounded unless it either calls my attention to an argument or controlling authority that was overlooked or disregarded in the original ruling, presents evidence or argument that could not previously have been submitted, or successfully points out a manifest error of fact or law.

The instant motion did none of those things, though it erroneously claimed I had not decided an issue.

At best, the motion simply expressed disagreement with my decision, and treated my ruling and order, in effect, as though they were an opponent's brief, the rationale of which was subject to refutation, rather than, as a judicial order, entitled to acknowledgment. The motion presented no basis on which it could, or should have been granted. It was, from the outset, an exercise in futility. But it still required a response from defendant and review and a ruling by me. As a result, the defendant's resources and my time were wasted.

I have adopted the practice, and shall continue to employ it, of imposing sanctions on attorneys who file unfounded motions for reconsideration. *See, e.g., American Trim, L.L.C. v. Oracle Corp.*, 230 F.Supp.2d 803, 804 (N.D.Ohio 2002) ("It is time that lawyers who file unfounded motions for reconsideration, which is all this motion really is, and renew objections to rulings that have been preceded by consideration of the arguments they simply repeat in support of motions to reconsider, come to understand that there will be a cost to their doing so. A party that prevails on rulings should not have to invest resources in having those rulings reconfirmed."); *Miller v. Norfolk Southern Rwy. Co.*, 208 F.Supp.2d 851, 854 (N.D.Ohio 2002) ("counsel who in the future file unfounded, unmerited, and unsuccessful motions for reconsideration simply because they disagree with a ruling, decision, or order should expect to be to be sanctioned to the full extent permitted under Rule 11 and 28 U.S.C. § 1927.").

 In this instance, I shall refrain from ordering the petitioner's attorneys to compensate the respondent for the time spent by those attorneys in responding to the motion for reconsideration. Instead, I shall decline to approve payment of petitioner's counsel for the time expended by them on this motion; their next fee petition shall expressly state that no compensation is being sought for that time.

By publication of this Order, I am notifying counsel representing capital habeas corpus petitioners that they are not immune from the sanctions that should be and are imposed on counsel who file unfounded motions for reconsideration. In the future, in addition to withholding compensation for the time spent on unmerited motions for reconsideration, counsel filing such motions shall be required to show cause why they should not reimburse the respondent for the attorneys' fees and expenses incurred in responding to such motions.

The same will be true where counsel for the respondent files an unmerited motion for reconsideration.

In light of the foregoing, it is

ORDERED THAT:

1. Petitioner's motion to alter or amend judgment be, and the same hereby is denied; and

2. Counsel for petitioner shall not be compensated for the time expended in relation to the instant motion; counsel's next application for approval of fees

shall state expressly that the compensation being sought does not include compensation relating to the instant motion.

So ordered.